# EXHIBIT A

## RETURN OF SERVICE

| | | |
|---|---|---|
| State of Florida | County of MIAMI-DADE | Circuit Court |

Case Number: 2020-020192-CA-01

Plaintiff:
**ALLPLUS COMPUTER SYSTEMS CORP, a Florida profit corporation**

vs.

Defendant:
**CISCO SYSTEMS, INC. a foreign profit corporation**

For:
JERRY BRESLIN, ESQ.
Baron, Breslin & Sarmiento, Attorneys At Law
169 E. Flagler Street
Suite 700
Miami, FL 33131

Received by LINDSAY LEGAL SERVICES, INC. on the 24th day of September, 2020 at 11:15 am to be served on **CISCO SYSTEMS, INC. BY SERVING REGISTERE AGENT-THE PRENTICE HALL CORPORATION SYSTEM, 1201 HAYS STREET, SUITE 105, TALLAHASSEE, FL 32301**.

I, MARY GREEN, do hereby affirm that on the **24th day of September, 2020** at **1:30 pm**, I:

**CORPORATE:** served by delivering a true copy of the **SUMMONS, CIVIL COVER SHEET AND COMPLAINT FOR DECLARATORY RELIEF** with the date and hour of service endorsed thereon by me, to: **KANEISHA GROSS** as **AUTHORIZED REPRESENTATIVE** for the Registered Agent of CISCO SYSTEMS, INC. BY SERVING REGISTERE AGENT-THE PRENTICE HALL CORPORATION SYSTEM at the address of: **1201 HAYS STREET, TALLAHASSEE, FL 32301**, and informed said person of the contents therein, in compliance with state statutes.

**Description** of Person Served: Age: 30+, Sex: F, Race/Skin Color: BLACK, Height: 5'6", Weight: 200, Hair: BLACK, Glasses: N

I certify that I am over the age of 18, have no interest in the above action, and am a Certified Process Server, in good standing, in the judicial circuit in which the process was served. Under penalty of perjury I declare that the facts contained herein are true to the best of my knowledge.NO NOTARY REQUIRED PURSUANT TO F.S. 92.525 (2).

**MARY GREEN**
Certified Process Server #243

**LINDSAY LEGAL SERVICES, INC.**
**7105 SW 8th STREET**
**SUITE 307**
**MIAMI, FL 33144**
**(305) 273-0317**

Our Job Serial Number: RLA-2020002304
Ref: 2020002304

Copyright © 1992-2020 Database Services, Inc. - Process Server's Toolbox V8.1c

Filing # 113734147 E-Filed 09/22/2020 09:37:33 AM

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

ALLPLUS COMPUTER SYSTEMS CORP.,
a Florida profit corporation,

     Plaintiff,

v.

                          CASE NO.: 2020-020192-CA-01

CISCO SYSTEMS, INC., a foreign profit
corporation,

     Defendant.

RUSH

Date: 9/24/20 Time: 1:30p

MDO 01242 is a certified process server in the
Circuit and County Courts in and for the
Second Judicial Circuit

_____/

**SUMMONS**

THE STATE OF FLORIDA:

To all and singular the Sheriff of said State:

     YOU ARE HEREBY COMMANDED to serve this Summons and a copy of the Complaint
or Petition in this action on:

**CISCO SYSTEMS, INC.**

**SERVE REGISTERED AGENT - THE PRENTICE HALL CORPORATION SYSTEM
1201 HAYS STREET, SUITE 105, TALLAHASSEE, FL 32301**

Each Defendant is required to serve written defenses to the Complaint or Petition on Jerry Breslin,
Esq., Baron, Breslin & Sarmiento, The DuPont Building, Suite 700, 169 East Flagler Street,
Miami, Florida 33131, Tel: 305-577-4626, Fax: 305-577-4630; Email:
JB@RichardBaronLaw.com  Plaintiff's attorneys, within twenty (20) days after service of this
Summons on that Defendant, exclusive of the day of service, and to file the original of the defenses
with the Clerk of the Court either before service on Plaintiff's attorney or immediately thereafter.
If a Defendant fails to do so, a default will be entered against that Defendant for the relief
demanded in the Complaint or Petition.

WITNESS my hand and the Seal of said Court

309877

As Clerk of said Court

9/23/2020

Page 1 of 2

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

ALLPLUS COMPUTER SYSTEMS CORP.,
a Florida profit corporation,

      Plaintiff,                            CASE NO.: _____

v.

CISCO SYSTEMS, INC., a foreign profit
corporation,

      Defendant.

_____/

## **COMPLAINT FOR DECLARATORY RELIEF**

      Plaintiff, ALLPLUS COMPUTER SYSTEMS CORP. (the "Plaintiff"), a Florida profit corporation, by and through its undersigned counsel, sues the defendant, CISCO SYSTEMS, INC. (the "Defendant"), a foreign profit corporation registered to conduct business in the State of Florida, and alleges:

### **Introduction**

      1.      This is an action for declaratory relief pursuant to § 86.021 of the Florida Statutes to declare a certain purported guaranty executed by the Plaintiff in the Defendant's favor invalid and unenforceable because it lacks sufficient consideration and attempts to guarantee an agreement which expressly cannot be operative on the date upon which the guaranty was executed.

      2.      The Plaintiff requests a speedy hearing and advance on the Court's trial calendar pursuant to § 86.111 of the Florida Statutes.

### **Parties, Jurisdiction and Venue**

      3.      The Plaintiff is a corporation organized and existing under the laws of the State of Florida, with its principal place of business located in Miami-Dade County, Florida.

      4.      The Defendant is a corporation organized and existing under the laws of the State of California and registered to conduct business in the State of Florida, with its principal place of business in Santa Clara County, California.

5.      Venue for this action properly lies in the Eleventh Judicial Circuit pursuant to the provisions of Sections 47.011 and 47.051, as the cause of action accrued in the Eleventh Judicial Circuit and the property in litigation, namely the Plaintiff's money sought by the Defendant in enforcement of the Guarantee, is located within the Eleventh Judicial Circuit.

## COUNT I

## DECLARATORY JUDGMENT SETTING ASIDE THE GUARANTEE

6.      The Plaintiff hereby realleges and incorporates paragraphs one (1) through five (5) *supra* as if fully set forth herein.

7.      The Plaintiff and the Defendant are alleged by the Defendant to be parties to a purported Guarantee (the Plaintiff asserts that the document is not binding or enforceable but for ease of reference will be referred to hereinafter as the "Guarantee") dated November 30, 2016. (attached hereto and incorporated herein as Exhibit A providing the purported Guarantee).

8.      The Guarantee was never executed by the Defendant.

9.      The Guarantee purports to apply California law to the interpretation of the document.

10.      However, if the Guarantee is not binding, then Florida law would apply.

11.      The Guarantee is not a valid or enforceable document and therefore is not binding under either Florida law or California law and its venue provisions unenforceable.

12.      Pursuant to that Guarantee, the Plaintiff guaranteed all sums due to the Defendant, up to $400,000.00, under a "Specialty Two Tier NonExclusive Distributor Agreement for Small Business dated from September 9, 2009 and subsequent amendments[] . . . ." *Id.* at 1, § A; *see also id.* at 1, § 1. (hereinafter the "Guaranteed Agreement"). (attached hereto and incorporated herein as Exhibit B).

13.      The Guarantee was only to "be effective from the date of last signature below and [to] continue in force until elapsed ninety (90) days following [] the Agreement's Effective Date of termination." *Id.* at 1, § 2.

14.      The Small Business Two-Tier NonExclusive Distributor Agreement (the "Guaranteed Agreement") Terms and Conditions set forth that it "shall commence on the Effective

Date and continue through to the 30th November 2011, unless sooner terminated, as set forth below. [It could] be renewed thereafter, *for another successive two (2) year term*[] . . . ." Exhibit B, § 19.1 (affixing the Guaranteed Agreement).

15.     Accordingly, the Guaranteed Agreement is clear that there can only be one (1) single successive two (2) years term, carrying the terms of the Agreement through, at the latest possible date, November 30, 2013.

### A.     California Law.

16.     Subsection (4) of Section 1550 of the California Civil Code provides that "[i]t is essential to the existence of a contract that there should be: . . . [a] sufficient cause or consideration."

17.     Section 2792 of the California Civil Code states that

[w]here a suretyship obligation is entered into at the same time with the original obligation, or with the acceptance of the latter by the creditor, and forms with that obligation a part of the consideration to him, no other consideration need exist. In all other cases there must be a consideration distinct from that of the original obligation.

18.     The seminal case on point applying Section 2792 of the California Civil Code dates back to 1935 and explains that "[a] guaranty of an antecedent debt of another must be supported by a consideration distinct from the original obligation[.]" *Pacific States Sav. Etc. Co. v. Stowell*, 7 Cal. App. 2d 280 (Cal. Ct. App. 1935).

19.     Because the Guarantee is entirely devoid of consideration from the Defendant and expressly seeks to guaranty an antecedent debt of another, the Guarantee is invalid and unenforceable. *See* Exhibit 1, *passim* (lacking any consideration).

20.     Furthermore, because the Guarantee seeks, on November 30, 2016, to guaranty an Agreement which expressly cannot be enforceable beyond November 30, 2013, the Guarantee is invalid and unenforceable. *See id.* at 1.

### B.     Florida Law.

21.     The law in Florida is well settled dating back to 1851 that every "contract[] must have [] actual, valid and valuable consideration to support it. If there is no consideration, it is *nudum pactum*; for the law of the land supplies no means, nor affords any remedy to compel the

performance of an agreement made without sufficient consideration." *Lines v. Smith*, 4 Fla. 47, 50 (Fla. 1851).

22. "In Florida, a guaranty executed independently of the principal contract must be supported by separate consideration." *Lenbro Holding, Inc. v. Falic*, 503 Fed. Appx. 906, 908 (11th Cir. 2013) (citing *Texaco, Inc. v. Giltak Corp.*, 492 So.2d 812, 814 (Fla. 1st DCA 1986)).

23. The United States Court of Appeals for the Eleventh Circuit went on to explain that

> Florida courts have carved out a limited exception to this rule where the principal and guaranty contracts are executed as part of the same transaction. [Citation omitted.] However, Florida courts have limited this exception to apply only where the principal and guaranty contracts are, or should have been, executed at the same time.

*Id.* at *908 (citing *Texaco*, 492 So.2d at 814; *von Dunser v. Se. First Nat'l Bank of Miami*, 367 So.2d 1094, 1095 (Fla. 3d DCA 1979); *Barnett Bank of S. Fla., N.A. v. University Gynecological Assocs., Inc.*, 638 So.2d 595, 595 (Fla. 4th DCA 1994); *Gordon v. Corporate Ins. Services, Inc.*, 374 So.2d 603, 604 (Fla. 3d DCA 1979)).

24. Finally, "[u]nder Florida law, '[a] promise, no matter how slight, qualifies as consideration if the promisor agrees to do something that he or she is not already obligated to do.'" *Id.* at 909 (quoting *Indus., Invs. & Agencies (Bahamas), Ltd. v. Panelfab Int'l Corp.*, 529 F.2d 1203, 1211 (5th Cir. 1976)).

25. Accordingly, as it is under California law, the Guarantee is also invalid and unenforceable under Florida law because it lacks sufficient consideration, was not executed contemporaneously with the Agreement, and does not contain a promise for the Defendant to do something which it was not already obligated to do.

## C.   <u>Venue.</u>

26. "Authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1645 (2018).

27. "Florida Courts are directed to give effect to agreements on forum selection in order to 'recognize the legitimate expectations of the contracting parties.'" *America Online, Inc. v.*

*Booker*, 781 So.2d 423, 425 (Fla. 3d DCA 2001) (quoting *Manrique v. Fabbri*, 493 So.2d 437, 440 (Fla. 1986)).

28.     "The only exception to this general rule is narrowly drawn where there is a showing that enforcement would be unreasonable or unjust; the exception is not triggered by mere inconvenience or additional expense." *Id.* (*citing Manrique*, 493 So.2d at 440).

29.     Here, enforcing the venue provision in the invalid and unenforceable Guarantee would be unreasonable and unjust considering the lodestar of justice that Courts will not lend their hands in carrying out illegal contracts, and this Court should not lend its hand in carrying out the venue provision of the invalid and unenforceable Guarantee.

30.     For that reason, venue for this litigation is not limited to California.

31.     Section 47.011 of the Florida Statutes provides that actions shall be brought "only in the county where the defendant resides, where the cause of action accrued, or where the property in litigation is located."

32.     Since the cause of action accrued in Miami-Dade County, Florida considering that the Plaintiff, the sole executing party of the Guarantee, is located in Miami-Dade County, Florida, and also since the property in litigation, namely the Plaintiff's money sought in enforcement of the Guarantee, is located in Miami-Dade County, Florida, venue is proper in Miami-Dade County, Florida.

**D.     Attorney's Fees.**

33.     Finally, the Plaintiff has become required to retain the undersigned counsel to litigate this action and is required to pay such counsel reasonable attorney's fees.

34.     While Section 11 of the Guarantee renders the Plaintiff unilaterally responsible for the Defendant's attorney's fees and costs, that provision must be mutual because "Section 1717 [of the California Civil Code] was originally enacted to make one-side attorney's fees clauses reciprocal . . . . [and] was subsequently amended to extend to reciprocal attorney fees clauses as well as one-sided clauses, in order to establish uniform treatment of fee recoveries in all actions on contracts containing attorney fees clauses and to eliminate distinctions based upon whether fee recovery is statutory or contractual." *Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.*, 2011 Cal. App. 4th 230, 245-46 (Cal. Ct. App. 2012).

35. The result is the same under Florida law. § 57.105 (7) of the Florida Statutes provides that a unilateral grant of attorney's fees to one party is deemed to be reciprocal by statute.

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court issue an order declaring that:

a. venue is appropriate in Miami-Dade County Florida as the Guarantee is void and unenforceable and therefore the venue provisions are not binding;

b. if applying California law as the Guarantee requires, the Guarantee should be set aside and voided because (i) it lacks sufficient consideration and (ii) it seeks to Guarantee an Agreement that cannot possibly be effective on the date on which the Guarantee was executed;

c. applying Florida law requires the same result;

d. that the Defendant must pay the Plaintiff's reasonable attorney's fees and costs considering that the attorney's fees clause in Section 11 of the Guarantee must favor both parties under either California law or Florida law; and

e. any and all other relief this Honorable Court deems just and proper.

Respectfully submitted,

/s/ Jerry Breslin

Jerry Breslin, Esq.
Florida Bar No. 269573
BARON, BRESLIN & SARMIENTO,
 ATTORNEYS AT LAW
The Dupont Building
169 East Flagler Street, Suite 700
Miami, FL 33131
Tel.: (305) 577-4626 | Fax: (305) 577-4630
E-mails: EService@RichardBaronLaw.com
         JB@RichardBaronLaw.com

Dated this 21st Day of September, 2020.

# EXHIBIT A

## GUARANTEE

**THIS DEED OF GUARANTEE** is made the November day of 30, 2016.

**BY**

**Allplus Computer Systems, Corp**, a company incorporated in Florida, having its offices at 3069 N.W. 107 Avenue, Miami, 33172 (**"the Guarantor"**)


**IN FAVOUR OF**

**Cisco Systems, Inc.**, a California corporation, having its principal place of business at 170 West Tasman Drive, San Jose, California, 95134 (**"Cisco"**)

And

**Cisco Comércio e Serviços de Hardware e Software do Brasil Ltda.**, a Brazilian corporation with a principal place of business at Av. das Nações Unidas, 12901, 2nd Floor, Room 1, Brooklin Novo, São Paulo, CEP 04578-000, Brazil (**"Cisco Brazil"**)

**WHEREAS:**

A.   Cisco has entered into a Specialty Two Tier NonExclusive Distributor Agreement for Small Business dated from **September 9, 2009** and subsequent amendments, (**"the Agreement"**) with **Alcateia Distribuidora Ltda.**, a Brazilian limited liability company, having its principal place of business at Rua Francisco de Sousa Melo, 1590, Armazéns 101 e 102, Cordovil, CEP 21010-410, city of Rio de Janeiro, State of Rio de Janeiro (**"Alcateia Distribuidora"**), **Alcateia Engenharia de Sistemas Ltda.**, a Brazilian limited liability company, with principal place of business at Rua dos Italianos, 1127, Bom Retiro, city of Sao Paulo, State of Sao Paulo – CEP 01131-000, Brazil (**"Alcateia Engenharia"**), (**"the Company"**).

B.   The Company is a related entity of the Guarantor.

D.   The Guarantor has agreed to provide the following guarantee of the Company payment obligations under the Agreement on the terms and conditions set out in this Guarantee.

**THE GUARANTOR AGREES AS FOLLOWS:-**

1 The Guarantor hereby unconditionally and irrevocably guarantees to Cisco and its respective successors and assigns the payment of all sums due by the Company up to the total amount of US$ 400,000.00 (Four hundred thousand dollars).

2   under the Agreement on the terms and conditions set out in this Guaranty (the "Obligations").This Guaranty will be effective from the date of last signature below and shall continue in force until elapsed ninety (90) days following to the Agreement's Effective Date of termination.If the Company should default in the due and punctual performance of any of the Obligations, or in the full and timely payment of any amounts owed in respect of the Obligations, then the Guarantor, upon request by Cisco in accordance with clause 4 below, will forthwith perform or cause to be performed such Obligations and will forthwith make

full payment of any amount due with respect thereto at its sole cost and expense within 15 days following Cisco's payment request.

1.   If the Company (unless relieved from the performance of the Agreement by Cisco or by statute or law or by a decision of a court or other tribunal of competent jurisdiction) fails to pay any sums due to Cisco in accordance with the terms of the Agreement, the Guarantor will, if required to do so by notice in writing from Cisco, cause the said sums to be paid to Cisco. For the avoidance of doubt, Cisco shall not be required to proceed against or take any legal action against or pursue any remedy with respect to the Company before Cisco may enforce rights against Guarantor hereunder.

2.   Notwithstanding anything to the contrary in this Guarantee, the obligations and liabilities of the Guarantor under this Guarantee shall not in any circumstances exceed the obligations and liabilities of the Company under the Agreement, and the Guarantor shall be entitled to all the same defences, limitations of liability and rights to which the Company is entitled under the Agreement (whether at law or in equity).

3.   Representations; Covenants. (a) Guarantor represents and warrants to Cisco that (i) Guarantor is a limited liability company duly organized, validly existing and in good standing under the law of its jurisdiction of organization, and has all requisite power and authority to execute, deliver and perform its obligations under this Guaranty; (ii) the execution, delivery and performance by Guarantor of this Guaranty have been duly authorized by all necessary corporate action of Guarantor; (iii) this Guaranty constitutes the legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms; (iv) As of the date hereof, no actions, suits or proceedings are pending or, to the best knowledge of Guarantor, threatened against Guarantor that might reasonably be expected to have a material and adverse effect in the performance by Guarantor of its obligations under this Guarantee or the financial condition of Guarantor; (v) All audited consolidated financial statements, profit and loss statements, herewith or hereafter given to Cisco by or on behalf of Guarantor are and will be true, complete and correct in all material respects as of the date thereof and the date hereof; (vi) There has been no material adverse change in the financial condition of Guarantor since the latest financial statements of Guarantor given to Cisco; (vii) Guarantor has filed all tax returns and has paid all of its current obligations before delinquent, including all taxes and all other payments required under applicable law, except those which are being contested in good faith by the appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with the general accounting principles applicable . (b) So long as this Guaranty shall be in effect, Guarantor will furnish to Cisco from time to time such information respecting Guarantor's financial condition as Cisco may from time to time reasonably request.

4.   The Guarantor agrees that this Guarantee is a continuing guarantee relating to the Obligations, including Obligations which may exist continuously or which may arise from time to time under successive transactions under the Agreement.

5.   No failure on the part of Cisco to exercise, and no delay in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, remedy, power or privilege preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights and remedies under this Guarantee are cumulative and not exclusive of any rights, remedies, powers and privileges that may otherwise be available to Cisco. The Guarantor hereby irrevocably and unconditionally waives:

(i) presentment, demand of payment, protest, notices and formalities of any kind, and any requirement that Cisco exhaust any right, power or remedy or proceed against the Company with respect to any outstanding debt or payment or against any other person under any other guaranty of, or security for, any of the obligations guaranteed hereunder and/or (ii) any objection they may have to the right of Cisco to accelerate the maturity of amounts due under the Agreement.

6.  This Guarantee shall be binding upon the Guarantor and its successors and assigns, and inure to the benefit of and be enforceable by Cisco and their successors, and assigns.  This Guarantee may not be amended except by a notice in writing signed by the Guarantor and Cisco.  No waiver of any rights of Cisco under any provision of this Guarantee or consent to any departure by Guarantor therefrom shall be effective unless in writing and signed by Cisco.

7.  Subrogation. Until the all payment due under this Guaranty are satisfied in full, Guarantor shall not have, and shall not directly or indirectly exercise, (i) any rights that it may acquire by way of subrogation under this Guaranty, by any payment hereunder or otherwise, (ii) any rights of contribution, indemnification, reimbursement or similar suretyship claims arising out of this Guaranty, or (iii) any other right which it might otherwise have or acquire (in any way whatsoever) which could entitle it at any time to share or participate in any right, remedy or security of Cisco as against the Company. If any amount shall be paid to Guarantor on account of the foregoing rights at any time when any payment is outstanding, such amount shall be held in trust for the benefit of Cisco and shall forthwith be paid to Cisco to be credited and applied to the Liabilities

8.  Neither party shall, without the prior written consent of the other, assign or otherwise transfer or dispose of its rights or obligations under this Guarantee.

9.  Any notice given hereunder shall be in writing and sent by prepaid first class registered or recorded delivery post to the following addresses and marked for the attention as follows:-

On behalf of Guarantor:
**Allplus Computer Systems, Corp**
3069 N.W. 107 Avenue, Miami, 33172
Florida, USA
Attn: Financial Manager


On behalf of Cisco:
**Cisco Systems, Inc.**
170 West Tasman Drive,
San Jose, California, 95134, USA
Attn:    Legal Department

**Cisco Comércio e Serviços de**
**Hardware e Software do Brasil Ltda.**
**Avenida das Nações Unidas, 12.901 – 2- andar**
**Brooklin – São Paulo**

or to such other address or marked for the attention of such other person as notified by that party from time to time and shall be deemed to have been given on the [fifth] business day following its being so posted properly addressed and stamped.

10. The validity, interpretation, and performance of this Guaranty shall be controlled by and construed under the laws of the State of California, United States of America as if performed wholly within the state and without giving effect to the principles of conflict of law, and the state and federal courts of California shall have exclusive jurisdiction over any claim arising under this Agreement.

11. Costs and Expenses. Guarantor agrees to pay on demand all reasonable costs and expenses of Cisco and reasonable fees and disbursements of counsel in connection with the enforcement, or preservation of any rights under, this Guaranty

IN WITNESS WHEREOF this Guarantee has been duly executed and delivered as a deed on the day and year first written above.

**Allplus Computer Systems, Corp**
(The Guarantor")

By: _____

Title:        President

Date:        11/30/2016

cknowledge and Accepted

Cisco Systems, Inc.:        _____

By:        _____

Title:        _____

Date:        _____


**Cisco Comércio e Serviços de**
**Hardware e Software do Brasil Ltda.**

By: _____

Name: _____

Title: _____

Date: _____

# EXHIBIT B



# CISCO SYSTEMS, INC.
## SPECIALTY TWO TIER NONEXCLUSIVE DISTRIBUTOR AGREEMENT FOR SMALL BUSINESS

This Specialty Two Tier Nonexclusive Distributor Agreement for Small Business (the "Agreement"), between Allplus Computer Systems Corp., a corporation organized under the laws of Florida with its principal place of business at 3075 NW 107th Avenue, Miami, Florida 33172, United States of America ("DISTRIBUTOR"), and Cisco Systems, Inc., a California corporation with its principal place of business at 170 West Tasman Drive, San Jose, California 95134, ("Cisco") is entered into as of the date of last signature below ("the Effective Date").

This Agreement consists of this signature page and the following attachments are incorporated into this Agreement by reference:

1. Small Business Two Tier Nonexclusive Distributor Agreement Terms and Conditions
2. EXHIBIT A: Minimum Order Quantities and Quarterly Goals
3. EXHIBIT B: Territory
4. EXHIBIT C: Minimum Terms and Conditions for Resellers
5. EXHIBIT C1: Indirect Channel Partner Agreement
6. EXHIBIT D: Support Obligations
7. EXHIBIT E:  Software Licensing Agreement
8. Exhibit F: Cisco Systems Point of sales & Inventory Requirements
9. Exhibit G: Compliance with Anti-Corruption Laws
10. Exhibit H: Affiliates List
11. Exhibit I: Internet Commerce Agreement

This Agreement is the complete agreement between the parties hereto concerning the subject matter of this Agreement and replaces any prior or contemporaneous oral or written communications between the parties. In the event of conflict between the terms of this Agreement and the terms of an Exhibit hereto, the terms of the Exhibit shall govern. There are no conditions, understandings, agreements, representations or warranties, express or implied, which are not specified herein. This Agreement may only be modified by a written document executed by the parties hereto.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed. Each party warrants and represents that its respective signatories whose signatures appear below have been and are on the date of signature duly authorized to execute this Agreement.

**Allplus Computer Systems Corp.**

Authorized Signature

Name   Alberto Rodrigues

Date   08/25/09

**Cisco Systems, Inc.**

Authorized Signature

Name   WARD H. Dickson

Date   Sept 9, 2009

**cisco**

## SMALL BUSINESS TWO-TIER NONEXCLUSIVE DISTRIBUTOR AGREEMENT
## TERMS AND CONDITIONS

**1.0     DEFINITIONS.**

*Affiliates* are the entities listed in Exhibit H to this Agreement, which are entities that are controlled by Distributor or subject to common control with Distributor and only for so long such companies are controlled by, or subject to common control with, Distributor. For the purposes of this definition, "control" means the possession of at least 50.1% of the voting power of an entity, either directly or indirectly through other controlled entities.

*Documentation* shall mean user manuals, training materials, Product descriptions and specifications, technical manuals, license agreements, supporting materials and other printed information relating to the Product, whether distributed in print, electronic, CD-ROM or video format.

*End User* is the final purchaser or licensee who has acquired Products for its own internal use and not for resale, remarketing or redistribution.  An entity that performs stocking, sparing or warehousing activities for third parties or procures Cisco Services or Software for delivery to third parties is not an End User.

*Global Price List Latin America* means a complete listing of Cisco products, services, including products and services which Cisco may, at its discretion, make available to DISTRIBUTOR in Latin America, and associated prices.

*Hardware* is the tangible product made available to DISTRIBUTOR.

*Major Release* or *New Release* means a release of Software which is designated by Cisco as a change in the ones digit in the Software version number [(x).x.x].

*Purchase Order* is a written or electronic order from Distributor to Cisco for Hardware, Software or services to be purchased, licensed or provided under this Agreement.

*Product* shall mean for the purposes of this Agreement, individually or collectively as appropriate, hardware, licensed Software, Documentation, developed products, supplies, accessories, and other commodities related to any of the foregoing, named by Cisco and referred to as "Small Business Products" and/or "Small Business Pro Products" that are to be accessed          via          the          following          link http://www.cisco.com/cisco/web/solutions/small_business/index.html on the Cisco site and listed on the then current published Wholesale Price List Latin America

*Reseller* means an authorized reseller or value added reseller of DISTRIBUTOR who has entered into a written contract with DISTRIBUTOR containing at a minimum the terms and conditions set forth at Exhibit C, and meeting Cisco's then-current guidelines for Resellers.

*Services* means any maintenance, or technical support and any other services Cisco makes available for purchase by DISTRIBUTOR on Cisco's Global Price List Latin America.

*Software* is the machine readable (object code) version of the computer programs listed from time to time on the Global Price List Latin America and made available by Cisco for license by DISTRIBUTOR, and any copies, Updates thereof.  Cisco reserves the right, during the term if this Agreement, to license and distribute items of Software from time to time.  Such

illilli
**CISCO**

items of Software may be licensed under additional or different policies and license terms, which will be made available to DISTRIBUTOR.

*Territory* is comprised of those regions or countries listed in Exhibit B.

*Update* means a bug fix, error correction, patch or workaround for the Software which is provided by Cisco to DISTRIBUTOR in response to DISTRIBUTOR's request, or at Cisco's option, which Cisco chooses to provide to DISTRIBUTOR.

*Wholesale Price List Latin America* shall mean a list containing Products and prices at which Cisco will sell such Products to DISTRIBUTOR in Latin America.

**2.0    SCOPE.**

This Agreement and the attached Exhibits set forth the terms and conditions for DISTRIBUTOR's purchase of Hardware and license of Software, and redistribution of Products and Services, during the term of this Agreement.

DISTRIBUTOR Affiliates listed in Exhibit H herein, as maybe be updated from time to time, may purchase Cisco Products and Services directly from Cisco under the terms and conditions of this Agreement. DISTRIBUTOR represents and warrants that it is empowered to enter into this Agreement on behalf of such Affiliates and to bind such Affiliates to the terms and conditions of this Agreement. References herein to Distributor shall be construed as to include the Affiliates.

DISTRIBUTOR hereby guarantees, and is jointly and severally liable for the Affiliates compliance with all contractual and financial obligations arising out of the Agreement.

**3.0    APPOINTMENT OF DISTRIBUTOR.**

3.1    By this Agreement Cisco makes and DISTRIBUTOR accepts, the appointment of DISTRIBUTOR as an authorized, non-exclusive distributor of Products and Services to Resellers within the Territory provided that DISTRIBUTOR at all times meets the support requirements set out at Exhibit D ("Support Obligations") in relation to each country in which it sells Products and Services by:

(i) fulfilling the Support Obligations directly or through its Affiliates; or

(ii) by such other arrangements as shall be to the reasonable satisfaction of Cisco.

As of the Effective Date, DISTRIBUTOR meets, for the purposes of selling Products and Services, the Support Obligations in the countries set out in Exhibit B ("Territory").

DISTRIBUTOR agrees to use its best efforts to distribute Product in the Territory. DISTRIBUTOR may not distribute product to Resellers outside the Territory. All Resellers to which DISTRIBUTOR distributes Product must meet Cisco's then current guidelines for Resellers as amended from time to time (Exhibit C).

3.2    DISTRIBUTOR is authorized to sell only those Products and/or Services which are listed on the Wholesale Price List Latin America. Notwithstanding the foregoing, Cisco may, in its discretion, make available for purchase and resale by DISTRIBUTOR certain other products and/or services which are listed on the Global Price List Latin America.  Upon such products or services being made available to

**CISCO**

DISTRIBUTOR, such products and services will be deemed to be Products and Services as defined herein.

3.3 Products Requirements. For new Products or Services added to the Wholesale Price List Latin America, including products or services which become available to Cisco as a result of an acquisition by Cisco of another entity, Cisco may impose certification, installation, or training requirements on DISTRIBUTOR prior to allowing DISTRIBUTOR to purchase, resell, or provide support for such Products or Services.

3.4 DISTRIBUTOR agrees not to solicit orders, engage salespeople, or establish warehouses or other distribution centers outside the Territory except to the extent advertising is placed in a particular advertising medium (except catalogs) which is distributed both inside and outside of the Territory.

**4.0 ORDERS.**

4.1 Order Process. DISTRIBUTOR shall purchase Products and Services by issuing a written or electronic purchase order signed (or sent in the case of an electronic order) by its authorized representative, indicating specific Products and Services, Cisco's product number, any internal product numbers assigned by DISTRIBUTOR, quantity, unit price, total extended net purchase price, complete shipping address and instructions, requested delivery dates and any other special instructions. A signed copy of the Internet Commerce Agreement (Exhibit I) must be on file with Cisco customer service prior to acceptance of orders submitted electronically via the Cisco Internetworking Product Center ("IPC"). Any contingencies contained on such Purchase Order are not binding upon Cisco.

4.2 All purchase orders issued under this Agreement shall reference this Agreement. The terms and conditions of this Agreement prevail regardless of any conflicting terms on any purchase order or other correspondence submitted by DISTRIBUTOR to Cisco. Any such conflicting terms are expressly rejected by Cisco.

4.3 All Purchase Orders are subject to approval and acceptance by the Cisco customer service order administration office of the Cisco entity which shall supply the Products and Services, and no other office is authorized to accept orders on behalf of Cisco. Cisco shall use commercially reasonable efforts to provide information regarding acceptance or rejection of such orders within ten (10) days from receipt thereof or within three (3) business days where orders are placed under CCO.

4.4 During the term of this Agreement, Cisco may make Product available for ordering and delivery from an alternate central location and/or a Cisco affiliate, if it chooses. In the event that Cisco does so, DISTRIBUTOR will order the Product according to the procedures set forth at the time such delivery becomes available. At such time, Products ordered in conformance with Cisco's policies will be shipped according to the availability and lead-times described in the procedures. Cisco shall have the right to change delivery terms and include additional charges, if any, at the time an alternate order and delivery process is implemented by Cisco.

4.5 Alteration or Cancellation of Orders. DISTRIBUTOR may defer the shipment of Products for no more than ninety (90) days from the scheduled shipping date, provided written notice is received by Cisco at least ten (10) days before the originally scheduled shipping date. Cancelled orders, rescheduled deliveries or Product configuration changes made by DISTRIBUTOR less than ten (10) days before the original shipping date will be subject to (a) acceptance by Cisco, and (b) a charge of

·l|···|l·
CISCO

fifteen percent (15%) of the total invoice amount.  Cisco reserves the right to reschedule delivery in cases of configuration changes made within ten (10) days of scheduled shipment.

**5.0   SHIPPING AND DELIVERY**

5.1   <u>Shipping Dates.</u>  Shipping dates will be established by Cisco upon its acceptance of purchase orders from DISTRIBUTOR.  Cisco shall use commercially reasonable efforts to assign shipping dates as close as practicable to DISTRIBUTOR's requested date.  However, Cisco shall not be liable for any damages, direct, consequential, special, punitive, or otherwise, to DISTRIBUTOR or to any other person for Cisco's (a) failure to fill any orders, (b) delay in delivery, (c) error in filling any orders for any reason whatsoever, or (d) failure to give notice of any delay or error.

5.2   <u>Shipping Terms; Risk of Loss</u>.  Shipping terms are FOB (per Uniform Commercial Code) or FCA (per INCOTERMS 2000) San Jose, California or another Cisco-designated shipment point.  Title and risk of loss or damage to Product shall pass from Cisco to DISTRIBUTOR, and delivery will be deemed to have occurred, upon transfer to the first common carrier or DISTRIBUTOR'S representative at the shipment point, whichever happens earlier.  DISTRIBUTOR shall be responsible for all freight, handling and insurance charges subsequent to delivery.

5.3   <u>Carriers.</u>  Unless given written instructions from DISTRIBUTOR, Cisco shall select the carrier.  Notwithstanding the foregoing, in no event shall Cisco have any liability in connection with shipment, nor shall the carrier be deemed to be an agent of Cisco. If DISTRIBUTOR requests delivery of Products to DISTRIBUTOR'S forwarding agent or other representative in the country of shipment, DISTRIBUTOR shall assume responsibility for compliance with applicable export laws and regulations, including the preparation and filing of shipping documentation necessary for export clearance.

5.4   <u>Original Boxes.</u>  DISTRIBUTOR shall have the right to obtain a reasonable quantity of original boxes at no charge within forty-five (45) days to replace boxes that are damaged.  Orders for boxes must be received by Cisco within forty-five (45) days pf DISTRIBUTOR'S order for the Product to be re-boxed.  If within forty-five (45) days DISTRIBUTOR has not received the boxes which it requested, DISTRIBUTOR may request a Return Material Authorization ("RMA") number from Cisco and follow Cisco's then-current RMA procedure.

**6.0   PAYMENT AND SECURITY INTEREST.**

6.1   <u>Prices.</u>   Prices for Products shall be those specified in Cisco's then current Wholesale Price List Latin America as updated from time to time by Cisco.  In its discretion, Cisco may choose to make products or services which are on the Global Price List Latin America but not on the Wholesale Price List Latin America available to DISTRIBUTOR.  The prices for such products or services will be provided by Cisco to DISTRIBUTOR at the time Cisco makes such products available.

6.2   All prices are FOB (per Uniform Commercial Code) or FCA (per INCOTERMS 2000) at San Jose, California or another Cisco designated shipment point.  Prices for the Product may be changed thirty (30) days after written notice to DISTRIBUTOR (the "Notice Period").  Purchase Orders received before the Notice Period, and those received during the Notice Period which specify a delivery date within sixty (60) days following the effective date of a price increase will be invoiced to DISTRIBUTOR without regard to the price change, provided that DISTRIBUTOR  may only order

CISCO

such items do not convey title to, or patent rights, copyrights or any other proprietary interest in, such items to DISTRIBUTOR.

9.3     Restricted Rights.  Software is provided to all agencies, departments, and other units of the United States Government except for the Department of Defense and its constituent agencies with LIMITED RIGHTS.  Related documentation is provided with RESTRICTED RIGHTS.  Use, duplication, or disclosure by the US Government, except for the Department of Defense and its constituent agencies, is subject to the restrictions set forth in subparagraph (c) of the "Commercial Computer Software—Restricted Rights" clause at FAR 52.227—19.  In the event of a sale to the Department of Defense or its constituent agencies, the US Government's rights in Software, supporting documentation, and technical data are subject to the restrictions in the "Commercial Computer Software and Commercial Computer Software Documentation" clause at DFARS 227.7202.

## 10.0    WARRANTY.

10.1    Cisco hereby represents and warrants that it has not entered into any agreements or commitments which are inconsistent with or in conflict with the rights granted to DISTRIBUTOR herein; and that the Product shall be free and clear of all liens and encumbrances.

10.2    Cisco agrees that DISTRIBUTOR shall be entitled to pass through to Resellers of the Product all written warranties provided by Cisco with a Product. DISTRIBUTOR shall cause Cisco's standard limited warranty and other terms included with each Product to be passed on to Resellers, and by Resellers to End Users.  Such warranty shall commence upon shipment by DISTRIBUTOR.

10.3    EXCEPT FOR THE WRITTEN WARRANTY PROVIDED BY CISCO WITH PRODUCTS, DISTRIBUTOR SHALL NOT MAKE ANY WARRANTY COMMITMENT, WHETHER WRITTEN OR ORAL, RELATING TO THAT PRODUCT ON CISCO'S BEHALF.   DISTRIBUTOR shall indemnify Cisco for any warranties made in addition to Cisco's standard warranty and for any misrepresentation of Cisco's reputation or the specifications, functionality, or compatibility of any Cisco Product.

10.4    DISCLAIMER.   CISCO MAKES NO OTHER WARRANTIES WITH RESPECT TO THE PRODUCT OR ANY SERVICES AND DISCLAIMS ALL OTHER WARRANTIES AND CONDITIONS, EXPRESS OR IMPLIED, INCLUDING THOSE OF MERCHANTABILITY, NONINFRINGEMENT, AND FITNESS FOR A PARTICULAR PURPOSE (EVEN IF THAT PURPOSE IS KNOWN TO CISCO), OR ARISING FROM A COURSE OF DEALING, USAGE OR TRADE PRACTICE, TO THE EXTENT PERMITTED BY APPLICABLE LAW.

## 11.0    TRAINING.

General sales and general technical support or other training for which Cisco requires attendance of DISTRIBUTOR shall be provided at no charge to DISTRIBUTOR.  Specialized training, including but not limited to CCIE training, will be available to DISTRIBUTOR through Cisco or Cisco training partners at the then-current prices charged by Cisco or its training partners.  DISTRIBUTOR may use co-op funds, if available, in connection with such training.

## 12.0    TRADEMARKS.

12.1    Acknowledgment of Rights.  DISTRIBUTOR acknowledges that Cisco holds all right, title and interest to the trademarks, service marks, or trade names owned, used or claimed now or in the future by Cisco ("Marks").

·ı|ı·ı|ı·
**CISCO**

12.2     <u>License Grant.</u> DISTRIBUTOR is permitted to use such Marks as are designated by Cisco from time to time in writing for all proper purposes in the sale of Product and the performance of DISTRIBUTOR's duties hereunder only for so long as this Agreement is in effect. DISTRIBUTOR's use of any such Marks shall be in accordance with Cisco's policies in effect from time to time, including, but not limited to, trademark usage and advertising policies. DISTRIBUTOR agrees not to attach any other trademarks, trade names, logos or labels to the Product other than an aesthetically proper label, identifying DISTRIBUTOR, its location and its relationship to Cisco. DISTRIBUTOR further agrees not to affix any Cisco Marks products other than Products. DISTRIBUTOR agrees that upon notice from Cisco it will immediately terminate it use of a particular Mark.

## 13.0    INVENTORY BALANCE.

DISTRIBUTOR may have the choice to make use of a "quarterly rotation allowance", as defined herein - "DISTRIBUTOR has the option to return to Cisco, for credit, up to three percent (3%) of the dollar value of products from the Wholesale Price List Latin America shipped to DISTRIBUTOR, net of credits, less returns to Cisco, and excluding all fulfillment to all 1 tier partners, in the preceding Cisco fiscal calendar quarter (each three calendar months), as notified by Cisco to DISTRIBUTOR within five (5) working days after the end of the Cisco fiscal calendar quarter".

Distributor shall be entitled to return such Product from the Wholesale Price List Latin America once per quarter period, provided such returns do not exceed the Quarterly Rotation Allowance.

Cisco shall credit DISTRIBUTOR's account in the amount of the price paid by DISTRIBUTOR therefor, less any price protection credits issued to DISTRIBUTOR related to the Product returned (the "Return Credit"). The following requirements must be met by DISTRIBUTOR:

13.1     The returned Product must (a) be in new and unused condition, (b) be in factory-sealed boxes, (c) be listed in Cisco's then-current published Wholesale Price List Latin America and (d) not be Third-Party Sourced Product. The phrase "new and unused condition . . . in factory sealed boxes" is intended to recognize that there may be cartons which are worn and/or have numerous shipping labels printed on, or affixed to, the shipping carton. It is intended that these units will qualify for repurchase as long as the contents are new and unused.

13.2     DISTRIBUTOR may submit the inventory balance claim between the first and twenty-first calendar days of the following months: February, May, August, and November.

13.3     At the time DISTRIBUTOR submits its inventory balance claim, it must place an offsetting order, for different Product, which must, unless otherwise agreed in writing between Cisco and DISTRIBUTOR, specify immediate shipment. Such offsetting order must be equal to or greater than the dollar value of the returned Product;

13.4     DISTRIBUTOR shall bear all shipping and handling charges to the Cisco designated United States site for Product returned for credit;

13.5     DISTRIBUTOR shall obtain an RMA number prior to returning any Product to Cisco. DISTRIBUTOR shall follow Cisco's then-current RMA process; and

**cisco**

13.6     DISTRIBUTOR reports must be provided to Cisco in accordance with Section 18.0.

## 14.0   RETURN OF OBSOLETE PRODUCT.

14.1     <u>Obsolete Products.</u>   Cisco will use commercially reasonable efforts to notify DISTRIBUTOR, including by electronic posting, of Product that is removed from Cisco's then-current published Wholesale Price List Latin America ("Obsolete Products").

14.2     <u>Right to Return.</u>   Provided DISTRIBUTOR provides required reports to Cisco in accordance with Section 18.0 of this Agreement, DISTRIBUTOR shall have the right to return Obsolete Product for full credit under Cisco's then-current RMA process. Such returns may not exceed the dollar value of DISTRIBUTOR's purchases of Obsolete Product in the ninety (90) day period preceding such obsolescence.

14.3     <u>Notification, Time Limit.</u>   DISTRIBUTOR must notify Cisco of the quantity of Obsolete Product to be returned to Cisco within thirty (30) days of notification of obsolescence by Cisco.   Such right to return is contingent upon return by DISTRIBUTOR of Obsolete Product within sixty (60) days of such notification by Cisco.   Such Product must be in new and unused condition and in factory sealed boxes.

## 15.0   QUALITY CONTROL.

Prior to shipment, Cisco shall test and inspect Products in accordance with ISO 9001 standards.

## 16.0   PATENT AND COPYRIGHT INDEMNITY.

16.1     Cisco will have the obligation and right to defend any claim, suit or proceeding brought against DISTRIBUTOR so far as it is based on a claim that any Product supplied hereunder infringes a United States copyright or a United States patent issued as of the Effective Date. Cisco's obligation specified in this paragraph will be conditioned on DISTRIBUTOR's notifying Cisco promptly in writing of the claim and giving Cisco full authority, information and assistance for the defense and settlement thereof. If such claim has occurred, or in Cisco's opinion is likely to occur, DISTRIBUTOR agrees to permit Cisco, at its option and expense, either (a) to procure for DISTRIBUTOR the right to continue using the Product;   (b)   replace or modify the same so that it becomes non-infringing; or, (c) if neither of the foregoing alternatives is reasonably available, immediately terminate Cisco's obligations (and DISTRIBUTOR's rights) under this Agreement with regard to such Product, and, if DISTRIBUTOR returns such Product to Cisco, refund to DISTRIBUTOR the price originally paid by DISTRIBUTOR to Cisco for such Product, less applicable credits paid to DISTRIBUTOR or Reseller, as depreciated or amortized by an equal annual amount over the lifetime of the Product as established by Cisco.

16.2     Notwithstanding the foregoing, Cisco has no liability for, and Integrator will indemnify Cisco against, any claim based upon: (a) the combination, operation, or use of any Product supplied hereunder with, equipment, devices, or software not supplied by Cisco; (b) services offered or used by Integrator through operation of the Products or revenue received by Integrator from its services; (c) alteration or modification of any Product supplied hereunder; or (d) Cisco's compliance with Integrator 's designs, specifications, or instructions.

16.3     Notwithstanding any other provisions hereof, Cisco shall not be liable for any claim based on DISTRIBUTOR's use of the Product as shipped after Cisco has informed DISTRIBUTOR of modifications or changes in the Product required to avoid such claims and offered to

alialia
CISCO

implement those modifications or changes, if such claim would have been avoided by implementation of Cisco's suggestions.

16.4   THE FOREGOING STATES THE ENTIRE OBLIGATION OF CISCO AND ITS SUPPLIERS AND THE EXCLUSIVE REMEDY OF DISTRIBUTOR, WITH RESPECT TO INFRINGEMENT OF PROPRIETARY RIGHTS. THE FOREGOING IS GIVEN TO DISTRIBUTOR SOLELY FOR ITS BENEFIT AND IN LIEU OF, AND CISCO DISCLAIMS, ALL WARRANTIES OF NON-INFRINGEMENT WITH RESPECT TO THE PRODUCT.

**17.0   SUPPORT.**
Support shall be provided in accordance with Exhibit E.

**18.0   REPORTS AND RECORDS.**
18.1   <u>Reports by Cisco.</u>   Cisco shall, if requested by DISTRIBUTOR, render monthly reports to DISTRIBUTOR setting forth the separate Product, dollars invoiced for each Product, and total dollars invoiced to DISTRIBUTOR for the month, and such other information as DISTRIBUTOR may reasonably request.

18.2   <u>Record-Keeping and Audit.</u>   DISTRIBUTOR will keep full, true, and accurate records and accounts, in accordance with generally accepted accounting principles, of each Product distributed. DISTRIBUTOR shall, upon fifteen (15) days prior written notice, during regular business hours at DISTRIBUTOR's principal place of business, allow Cisco or its designate to (i) audit such records, (ii) examine DISTRIBUTOR's place(s) of business, and (iii) examine DISTRIBUTOR's inventories of Product for the purpose of verifying to the satisfaction of Cisco that DISTRIBUTOR is performing its obligations under this Agreement. DISTRIBUTOR shall bear all costs incurred by Cisco in the performance of any audit which discloses any material breach of this Agreement.

18.3   <u>Reporting.</u>
18.3.1   DISTRIBUTOR shall render monthly sales out reports on diskette, in ASCII Comma Delimited Format, transmitted via email or Electronic Data Interchange ("EDI"). Information provided will include the following: (a) day, month, and year sales activity occurred, (b) Cisco's Product number, (c) internal Product number assigned by DISTRIBUTOR, (d) description of Product and Reseller name and Reseller's location, (e) unit cost (DISTRIBUTOR's net buying price from Cisco at quantity one) and (f) quantity   and   extended   cost   (cost   multiplied   by   quantity).

18.3.2   Similarly, DISTRIBUTOR will provide monthly inventory reports in the same format as sales-out reports.   These inventory reports will contain the following information: (a) Cisco Product number, (b) DISTRIBUTOR product number, (c) Product description, (d) quantity, (e) unit cost, (f) extended cost and (g) quantity committed by DISTRIBUTOR to Resellers but not yet shipped                                    to                                    Resellers.

18.3.3   The provisions of Price Protection (Section 7.0), Inventory Balance (Section 13.0), Return of Obsolete Product (Section 14.0), and Repurchase Following Termination (sub-section 19.5) are contingent upon the receipt of regular, timely point of sale ("POS") and inventory reports from DISTRIBUTOR. Cisco's obligation to provide these provisions is null and void if the inventory reports required to validate DISTRIBUTOR's requests for the above

**CISCO**

provisions are not provided to Cisco at the time of such request.

18.3.4 Cisco and DISTRIBUTOR agree to cooperate on future automation of POS and                              Inventory                              reporting.

18.3.5 It is the intention of the parties to facilitate Cisco's ability to obtain weekly sales              information              from              DISTRIBUTOR.

18.3.6 DISTRIBUTOR agrees to use commercially reasonable efforts, commensurate with the manner in which DISTRIBUTOR treats any of its other leading vendors, in order to facilitate Cisco's ability to obtain weekly sales information from DISTRIBUTOR via EDI.

18.4   Upon reasonable notice by Cisco, DISTRIBUTOR agrees to provide Production planning information for use by Cisco.

18.5   ECCN Numbers.   Upon request by DISTRIBUTOR, Cisco agrees to make available to DISTRIBUTOR the Export Control Classification Number (ECCN) for each of Cisco's Product and information as to whether or not any of such Product are classified under the U.S. Munitions license.

18.6   Third-Party Sourced Product.   If DISTRIBUTOR resells Cisco Product purchased from a source other than Cisco ("Third Party Sourced Product"), DISTRIBUTOR shall include name and country of End User for each transaction in a POS report. Monthly inventory reports will reflect DISTRIBUTOR inventory on the last day of the calendar month, must be delivered to Cisco within 5 days after the close of each calendar month, and must contain at least the following information: (a) DISTRIBUTOR name, (b) DISTRIBUTOR country, (c) inventory report date, (d) Cisco Product code, (e) Product description, (f) quantity, (g) unit cost, and (h) extended cost. If DISTRIBUTOR purchases (for resale) Cisco product from a source other than Cisco, DISTRIBUTOR shall identify the complete name and country of supplier in the monthly inventory report.

18.7   Cisco has no obligation to treat Third Party Sourced Products with respect to any provision of this Agreeent as if such Products had been purchased directly from Cisco.   If DISTRIBUTOR resells Third Party Sourced Product to a reseller, then DISTRIBUTOR shall inform the reseller that the Product may not have the proper software license from Cisco.   The DISTRIBUTOR shall also instruct the reseller that it must contact Cisco in order to obtain the proper software license and that the software license may require the payment of a fee directly to Cisco.   Cisco may refuse to provide warranty service if DISTRIBUTOR is unable to document that the returned Product was originally purchased from DISTRIBUTOR in accordance with the reporting procedure set forth above.

## 19.0   TERM AND TERMINATION.

19.1   This Agreement shall commence on the Effective Date and continue through to the 30th November 2011, unless sooner terminated, as set forth below.   This Agreement may be renewed thereafter, for another successive two (2) year term, subject to DISTRIBUTOR satisfactorily meeting Cisco's due diligence and other business requirements per a renewal amendment signed -or electronically accepted- by both parties or by written notice from Cisco to DISTRIBUTOR given at least thirty (30) days prior to the end of the then-current term of the Agreement. Any extension shall be on the same terms and conditions then in force except as may be mutually agreed in writing by the parties.

.ı|ııı|ıı
**CISCO**

Notwithstanding the right to renew, each party acknowledges that this Agreement shall always be interpreted as being limited in duration to a definite term and that the other party has made no commitments whatsoever regarding the duration or renewal of this Agreement beyond those expressly stated herein.

19.2 Termination for Convenience. Either party may terminate this Agreement, without cause, by giving the other party thirty (30) days prior written notice. With respect to an Affiliate, any termination of a particular Affiliate's rights under this Agreement shall not automatically terminate any other Affiliate's rights and obligations under this Agreement. Notwithstanding the foregoing, Cisco may terminate this Agreement immediately upon written notice in the event of breach by DISTRIBUTOR of Section 9.0, Section 21.0 or Section 23.0 of this Agreement.

19.3 Termination for Cause. In the event that either party materially defaults in the performance of any of its duties or obligations set forth in this Agreement, and such default is not substantially cured within thirty (30) days after written notice is given to the defaulting party specifying the default, then the party not in default may, by giving written notice thereof to the defaulting party, terminate this Agreement as of the date specified in such notice of termination.

19.4 Termination for Insolvency. Either party may immediately terminate this Agreement and any purchase order by giving written notice to the other party in the event of (a) the liquidation or insolvency of the other party, (b) the appointment of a receiver or similar officer for the other party, (c) an assignment by the other party for the benefit of all or substantially all of its creditors, (d) entry by the other party into an agreement for the composition, extension, or readjustment of all or substantially all of its obligations, or (d) the filing of a meritorious petition in bankruptcy by or against the other party under any bankruptcy or debtors' law for its relief or reorganization.

19.5 Effect of Termination. Upon termination of this Agreement:
    19.5.1 All rights and licenses of DISTRIBUTOR hereunder shall terminate and DISTRIBUTOR shall immediately discontinue all representations that it is a Cisco distributor.
    19.5.2 The due date of all monies due either party shall automatically be accelerated such that they become due and payable on the effective date of termination, even if longer terms had been provided previously.
    19.5.3 DISTRIBUTOR shall immediately return to Cisco all Proprietary Information and data (including all copies thereof) then in DISTRIBUTOR's possession or custody or control retaining only sufficient material to fulfill remaining orders and to service the installed base of End Users as mutually agreed upon by Cisco and DISTRIBUTOR, including, without limitation: (a) all technical materials and business plans supplied by Cisco to DISTRIBUTOR; (b) all manuals covering the Product; and (c) any End User, Reseller, or prospect lists provided by Cisco.

19.6 DISTRIBUTOR AGREES THAT, IN THE EVENT OF ANY TERMINATION OF THIS AGREEMENT, IT SHALL HAVE NO RIGHTS TO DAMAGES OR INDEMNIFICATION OF ANY NATURE, SPECIFICALLY INCLUDING COMMERCIAL SEVERANCE PAY, WHETHER BY WAY OF LOSS OF FUTURE PROFITS, EXPENDITURES FOR PROMOTION OF ANY PRODUCT, OR OTHER COMMITMENTS IN CONNECTION WITH THE BUSINESS AND GOOD WILL OF DISTRIBUTOR. DISTRIBUTOR EXPRESSLY WAIVES AND RENOUNCES ANY CLAIM TO COMPENSATION OR INDEMNITIES FOR ANY TERMINATION OF A BUSINESS RELATIONSHIP.

CISCO

19.7 Repurchase Following Termination.

19.7.1 Cisco may, at its option, repurchase from DISTRIBUTOR all Product in inventory (excluding Third-Party Sourced Product), which are in new and unused condition and in factory sealed boxes. Such repurchase shall be at the original price paid less any deduction for price protection.

19.7.2 DISTRIBUTOR shall submit to Cisco within fifteen (15) days after the effective date of termination a list of all Product owned by DISTRIBUTOR (excluding Third-Party Sourced Product) as of the effective date of the termination. Upon receipt of such list by Cisco and receipt of notice from Cisco of its exercise of this option, DISTRIBUTOR may commence returning Product under Cisco's then-current RMA process. DISTRIBUTOR will have up to forty-five (45) days from the effective date of termination to return Product under this section.

19.7.3 After receipt of Cisco Product from DISTRIBUTOR, Cisco will issue a credit to DISTRIBUTOR's account. If such credit exceeds amounts due from DISTRIBUTOR, Cisco shall remit in the form of a check to DISTRIBUTOR the excess within thirty (30) business days of receipt of the Product.

**20.0 FORCE MAJEURE.**

20.1 Definition. The term "Force Majeure" shall be defined to include fires or other casualties or accidents, acts of God, shortages of supplies, severe weather conditions, strikes or labor disputes, war or other violence, or any law, order, proclamation, regulation, ordinance, demand or requirement of any governmental agency.

20.2 Effect. A party whose performance is prevented, restricted or interfered with by reason of a Force Majeure condition (other than obligations to pay monies due and owing to Cisco by DISTRIBUTOR) shall be excused from such performance to the extent of such Force Majeure condition so long as such party provides the other party with prompt written notice describing the Force Majeure condition and immediately continues performance whenever and to the extent such causes are removed.

20.3 Termination Rights. If, due to a Force Majeure condition, the scheduled time of delivery of performance is or will be delayed for more than ninety (90) days after the scheduled date, the party not relying upon the Force Majeure condition may terminate, without liability to the other party, any purchase order or portion thereof covering the delayed Products or Services.

**21.0 CONFIDENTIALITY.**

DISTRIBUTOR acknowledges that, in the course of selling Products and Services and performing its duties under this Agreement, DISTRIBUTOR, its Resellers, and End Users to which DISTRIBUTOR provides access to Cisco technical data (including without limitation Products, Services, and technical data made available on Cisco Connection Online pursuant to Exhibit E), may obtain information relating to Products, Services, or to Cisco, which is of a confidential and proprietary nature ("Proprietary Information"). Such Proprietary Information includes, but is not limited to, trade secrets, know-how, inventions, techniques, processes, programs, schematics, software source documents, data, Customer lists, financial information and sales and marketing plans. Cisco owns and intends to maintain its ownership of all such Proprietary Information. DISTRIBUTOR shall at all times, both during the term of this Agreement and for a period of at least two (2) years after its termination,

**CISCO**

maintain in the strictest confidence and trust all such Proprietary Information, and shall not use such Proprietary Information other than in the course of its duties under this Agreement, nor shall DISTRIBUTOR disclose any of such Proprietary Information to any party without the prior written consent of Cisco. DISTRIBUTOR shall appropriately bind each of its employees to whom such disclosure is made, to hold the Proprietary Information in strict confidence and not to disclose such information to any person other than as is necessary in the course of its employment by DISTRIBUTOR and will indemnify Cisco for all damages suffered by Cisco in the event of wrongful disclosure of such Proprietary Information.

**22.0    EXPORT RESTRICTIONS.**

22.1 Applicability. DISTRIBUTOR hereby acknowledge that the products and technology or direct products thereof ("Products and Technology"), supplied by Cisco under this Agreement are subject to export controls under the laws and regulations of the United States (U.S.) and any other applicable countries' laws and regulations. DISTRIBUTOR shall comply with such laws and regulations governing export, re-export, transfer and use of Cisco Products and Technology and will obtain all required U.S. and local authorizations, permits, or licenses. Cisco DISTRIBUTOR agrees to provide the other information, support documents and assistance as may reasonably be required by the other in connection with securing export authorizations and/or producing government required reports. Information regarding compliance, export, re-export and transfer laws may be located at the following URL: http://www.cisco.com/web/about/doing_business/legal/global_export_trade/index.html

DISTRIBUTOR agrees not to use any export and/or re-export licenses or authorizations that Cisco or its affiliates holds for securing their own activities unless specifically authorized by Cisco's Global Export Trade and where legally compliant. DISTRIBUTOR agrees to institute and maintain an effective internal export compliance program to ensure compliance with their export and re-export activities.

22.2 Government/Military Sales. DISTRIBUTOR hereby certifies that none of the products, services, or technical data supplied by Cisco under this Agreement will be knowingly sold or otherwise transferred to, or made available for use by or for, any government or military end-user or in any government or military end-use located in or operating under the authority of any country not identified in Supplement No. 1, Country Group A:1 to Part 740 of the EAR without US or other country's export authorizations.

22.3 DISTRIBUTOR also certifies that none of the products, services or technical data supplied by Cisco under this Agreement will be knowingly sold or otherwise transferred to, or made available for use by or for, any entity that is engaged in the design, development, production or use of nuclear, biological or chemical weapons or missiles or is otherwise restricted from receiving Cisco products without US or other country's export authorizations.

22.4 Trade Data. DISTRIBUTOR may locate ECCN (Export Control Classification Number), HTS (Harmonized Tariff Schedule), French DCSSI Authorization, Encryption Strength, Encryption Status and CCATS (Commodity Classification Automated Tracking System) number at the following URL: http://tools.cisco.com/legal/export/pepd/Search.do

22.5 Record-Keeping. DISTRIBUTOR agrees to maintain a record of sales, imports, exports and re-exports of Cisco Products and Technology in accordance with the DISTRIBUTOR's records retention programs in the appropriate geographies but at least five years.

CISCO

22.6 <u>Obligation</u>. DISTRIBUTOR's obligation under this Article shall survive the expiration or termination of this Agreement.

**23.0    COMPLIANCE WITH LAWS.**
DISTRIBUTOR hereby represents and warrants that (a) it shall comply with all applicable local and national laws and regulations, (b) this Agreement and all of its terms are in full conformance and in compliance with such laws, and (c) it shall not act in any fashion or take any action which will render Cisco liable for a violation of the U.S. Foreign Corrupt Practices Act, which prohibits the offering, giving or promising to offer or give, directly or indirectly, money or anything of value to any official of a government, political party or instrumentality thereof in order to assist it or Cisco in obtaining or retaining business.

**24.0    LIMITATION OF LIABILITY.**
NOTWITHSTANDING ANYTHING ELSE HEREIN, ALL LIABILITY OF CISCO AND ITS SUPPLIERS UNDER THIS AGREEMENT OR OTHERWISE, SHALL BE LIMITED TO THE MONEY PAID TO CISCO UNDER THIS AGREEMENT DURING THE SIX (6) MONTH PERIOD PRECEDING THE EVENT OR CIRCUMSTANCES GIVING RISE TO SUCH LIABILITY. THIS LIMITATION OF LIABILITY IS CUMULATIVE AND NOT PER INCIDENT. THE LIMITATIONS IN THIS SECTION SHALL APPLY NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY.

**25.0    CONSEQUENTIAL DAMAGES WAIVER**
IN NO EVENT SHALL CISCO OR ITS SUPPLIERS BE LIABLE FOR ANY LOSS OF USE, INTERRUPTION OF BUSINESS, LOST PROFITS, OR LOST DATA, OR INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES OF ANY KIND REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR OTHERWISE, OR FOR ANY COSTS OR EXPENSES FOR THE PROCUREMENT OF SUBSTITUTE PRODUCT OR SERVICES IN EACH CASE, EVEN IF CISCO OR ITS SUPPLIERS HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**26.0    GENERAL PROVISIONS.**

26.1    <u>Performance of DISTRIBUTOR.</u>  DISTRIBUTOR warrants that it will at no time do, cause, or permit to be done, published, or said, any information, act or thing which is or may be detrimental to the best interests or the business reputation of Cisco.

26.2    <u>Binding Nature, Assignment, and Subcontracting.</u>  This Agreement shall be binding on the parties and their respective successors and assigns.  DISTRIBUTOR may not assign this Agreement without the prior written consent of the other party.

26.3    <u>Counterparts.</u>  This Agreement may be executed in several counterparts, all of which taken together shall constitute one single agreement between the parties.

26.4    <u>Headings.</u>  The section and sub-section headings used in this Agreement are for reference and convenience only and shall not be considered in the interpretation of this Agreement.

26.5    <u>Relationship of Parties.</u>  DISTRIBUTOR and Cisco will at all times perform their respective obligations pursuant to this Agreement as independent contractors. Nothing set forth in this Agreement shall be construed to create the relationship of principal and agent, master and servant, or employer and employee  between DISTRIBUTOR and Cisco.  Both Cisco and DISTRIBUTOR specifically disclaim any intent to create through this Agreement the relationship of franchisor and franchisee.

**CISCO**

Neither party shall act or represent itself, directly or by implication, as an agent of the other party.

26.6   Notices.  Wherever one party is required or permitted to give notice to the other pursuant to this Agreement, such notice shall be deemed given when delivered in hand, by facsimile, overnight courier, or when mailed by registered or certified mail, return receipt requested, postage prepaid, and addressed as follows:

**Notices to Cisco:**
Cisco Systems, Inc.
170 W. Tasman Drive
San Jose, CA  95134-1706
 Attn: Vice President, Distribution
        Channels
Fax: 408-526-6950

**Notices to DISTRIBUTOR:**
Allplus Computer Systems CORP
3075 NW 107TH avenue
Doral FL 33172
Att: Camilo Rodrigues
Fax (305)436-3994

**With a copy to:**
Cisco Systems, Inc.
Legal Department
170 W. Tasman Drive
San Jose, CA 95134-1706
Attn: General Counsel
Fax: 408-526-7019

Either party may from time to time change its address for notification purposes by giving the other party written notice of the new address and the date upon which it will become effective.

26.7   Severability.  If, but only to the extent that, any provision of this Agreement is declared or found to be illegal, unenforceable or void, then both parties shall be relieved of all obligations arising under such provision, it being the intent and agreement of the parties that this Agreement shall be deemed amended by modifying such provision, to the extent necessary to make it legal and enforceable while preserving its intent.

26.8   Waiver.  A waiver by either of the parties of any covenants, conditions or agreements to be performed by the other or any breach thereof shall not be construed to be a waiver of any succeeding breach thereof or of any other covenant, condition or agreement herein contained.

26.9   Non-exclusive Market and Purchase Rights.  It is expressly understood and agreed that this Agreement does not grant to Cisco or DISTRIBUTOR an exclusive right to purchase or sell Products and shall not prevent either party from developing or acquiring or selling competing Products of other vendors or customers.

26.10  Entire Agreement.  This Agreement, including any Exhibits and documents referred to in this Agreement or attached hereto, constitutes the entire and exclusive statement of Agreement between the parties with respect to its subject matter and there are no oral or written representations, understandings or agreements relating to this Agreement which are not fully expressed herein.

**CISCO**

26.11   <u>Governing Law.</u>   This Agreement shall have California as its situs and shall be governed by and construed in accordance with the laws of the State of California, without regard to its conflict of laws provisions.  The parties specifically disclaim the application to this Agreement of the UN Convention on Contracts for the International Sale of Goods.

26.12   <u>Survival.</u>  Sections 9.0, 10.0, 12.0, 18.0, 21.0, 22.0, 23.0, 24.0, 25.0 and 27.0, and sub-section 19.5, shall survive termination or expiration of this Agreement.



**CISCO**

**EXHIBIT A**

## MINIMUM ORDER QUANTITIES AND QUARTERLY GOALS

1.  Within one (1) week of the Effective Date of this Agreement, DISTRIBUTOR shall place an initial stocking order for immediate shipment equal to _____ . Thereafter, the minimum order quantity for purchase orders placed by DISTRIBUTOR shall be _____. The minimum order quantity shall be subject to change by Cisco upon thirty (30)      days      prior      written      notice      to      DISTRIBUTOR.

2.  DISTRIBUTOR's Annual Product Sales Out Volume Goals (in US$)

| 1st QTR | 2nd QTR | 3rd QTR | 4th QTR | TOTAL |
|---------|---------|---------|---------|-------|
|         |         |         |         |       |

5.  DISTRIBUTOR's Quarterly Goals For Recruitment of New Resellers

| 1st QTR | 2nd QTR | 3rd QTR | 4th QTR | TOTAL |
|---------|---------|---------|---------|-------|
|         |         |         |         |       |

**CISCO**

**EXHIBIT B**

**TERRITORY**

Brazil

··|··|··
CISCO

**EXHIBIT C**

**MINIMUM TERMS AND CONDITIONS FOR RESELLERS**

Definitions

(a) "Reseller" means an authorized Reseller or value added Reseller who has purchased Product from DISTRIBUTOR subject to DISTRIBUTOR's Agreement with Cisco and who fulfils the requirements of these guidelines.

(b) "Products" means Cisco hardware, licensed Software, documentation, developed Products, supplies, accessories, and other commodities related to any of the foregoing, provided or to be provided by Cisco pursuant to Cisco's agreement with DISTRIBUTOR.

(c) "Software" means the Cisco software in object code and distributed either embedded into the hardware or separate from the hardware, and any Updates or New Releases which DISTRIBUTOR receives under its agreement with Cisco.

(d) All other capitalized terms have the meaning ascribed to them in the Agreement.

2. Reseller Minimum Requirements

(a)    The Reseller's Territory shall be no greater than DISTRIBUTOR's Territory.

(b)    The DISTRIBUTOR shall grant a non-transferable, non-exclusive right to Reseller to sell, support and install the Products directly to end-users (as defined in the Agreement).

(c)    No title to the proprietary rights in any Products or documentation is transferred to Reseller by Cisco or DISTRIBUTOR.

(d)    Reseller shall not translate, reverse compile or disassemble the Software.

(e)    Reseller shall not remove, alter or destroy any form of copyright notice, proprietary markings or confidential legends placed upon or contained within the Product or documentation.

(f)    Reseller shall keep all Cisco Confidential Information confidential.

(g)    Reseller may use Cisco's Marks in distribution, advertising and/or promotion of the Products only in accordance with policies regarding advertising and trademark usage as established from time to time by Cisco. Reseller shall cooperate with Cisco in facilitating Cisco's monitoring and control of the nature and quality of products and services supplied in connection with the Marks.

(h)    Reseller acknowledges that Cisco makes no warranty to Reseller of any kind with respect to the Product, express or implied, including, without limitation, the implied warranties of merchantability, fitness for a particular purpose and non-infringement of third party rights. Cisco shall not be liable to Reseller or its customers for indirect or consequential damages.

(i)    DISTRIBUTOR may not without Cisco's prior written consent resell nor permit any Reseller or other party to resell Cisco Products to any entity which is not an Authorized Source or which Cisco may reasonably designate to be ineligible to procure Cisco products ("Unauthorized Reseller") even if the same shall previously have been authorized. Any purported sale of any Product or granting of a license to distribute

**CISCO**

Software to an Unauthorized Reseller is void. Furthermore, any use of Software pursuant to a license granted to or by, or transfer to or by, an Unauthorized Reseller constitutes a breach of the Software license. For purposes of these guidelines, any entity which invoices another entity for any Cisco Products or Software shall be considered a reseller, and therefore shall be deemed an Unauthorized Reseller if so designated by Cisco, even if such entity is doing so merely pursuant to an appointment to be the agent of such other entity.

(j) Reseller acknowledges that Cisco shall not be held to any liability whatsoever with respect to any claim of the Reseller on account of the use or performance of any Product. Reseller shall not make or pass on, and shall take all measures necessary to ensure that neither it nor any of its agents or employees make or pass on, any warranty or representation on behalf of Cisco to any customer, end user, or third party. Cisco has no obligation to furnish any assistance, information or documentation to Reseller with respect to the Product.

(k) Reseller shall take all reasonable steps when making proposals and agreements with foreign governments other than the United States, which involve the Product and related documentation to ensure that Cisco's proprietary rights in such Product and related documentation receive the maximum protection available from such foreign government for commercial computer software and related documentation developed at private expense.

(l) Cisco may require Reseller to execute a separate Indirect Channel Partner Agreement with Cisco based on the template contained in Exhibit C1 prior to allowing Reseller access to any special pricing, price deviations, price protection, or other Cisco sales and marketing programs, as may be made available to Reseller by Cisco from time to time.

cisco
CISCO

**EXHIBIT C1**
**INDIRECT CHANNEL PARTNER AGREEMENT**

**To register as an Indirect Channel Partner with Cisco, your company must accept the terms and conditions of this Indirect Channel Partner Agreement (the "Agreement"). This Agreement applies to Registered Partners that are "Resellers" and "Professional Service Providers", as defined in Part A below.**

This Agreement is entered into by and between the company you identified in the applicable Partner Registration Application ("**Partner**") and Cisco.  For purposes of this Agreement, Cisco is defined as follows:

- If Partner's principal place of business is located in Canada, "**Cisco**" is defined as Cisco Systems Canada Co., a Canadian corporation having its principal place of business at 181 Bay Street, Suite 3400, P.O. Box 802, Toronto, Ontario, M5J 2T3, Canada.

- If Partner's principal place of business is located in Japan, "**Cisco**" is defined as Cisco Systems G.K., a Japanese corporation having its principal place of business at 9.7.1, Akasaka, Minato-ku, Tokyo 107-6227, Japan.

- If Partner's principal place of business is located in Latin America or the Caribbean (the "**Emerging Markets – West**", or the United States of America (the "**United States**"), "**Cisco**" is defined as Cisco Systems, Inc., a California corporation having its principal place of business at 170 West Tasman Drive, San Jose, California 95134, United States.

- If Partner's principal place of business is located in the Asia Pacific region (excluding Australia and Japan), or the Middle East, Africa, Central and Eastern Europe (excluding member states of the European Economic Area), and Russia and the Commonwealth of Independent States (CIS), (together, the "**Emerging Markets – Central/East**"), "**Cisco**" is defined as Cisco Systems International B.V., a corporation having its principal place of business at Haarlerbergpark, Haarlerbergweg 13-19, 1101 CH, Amsterdam, the Netherlands.

If Partner is also a Reseller (as defined below), Partner may also be referred to as "**Reseller**" in Part B of this Agreement. This Agreement shall become effective as of the date it is click-accepted by the Partner (the "**Effective Date**").

This Agreement is divided into 3 Parts, which apply as follows:

**Part A, Definitions:** Applies to all Registered Partners.
**Part B, Reseller Terms and Conditions:** Only applies to Registered Partners acting as Resellers.
**Part C, General Terms and Conditions:** Applies to all Registered Partners.

If Cisco and Partner have signed a Pre-Existing Agreement that is in effect as of the day Partner submits this Agreement, the Pre-Existing Agreement shall take precedence over this Agreement. If no Pre-Existing Agreement exists, this Agreement comprises the complete agreement between the parties hereto concerning the subject matter herein and replaces any prior oral or written communications between the parties, all of which are excluded. In the event that a Registered Partner acting as a Reseller later executes a direct resale agreement (a "**Systems Integrator Agreement**") with Cisco after this Agreement is executed, such Systems Integrator Agreement shall take precedence over and supersede this Agreement. There are no other conditions, understandings, agreements, representations, or warranties, expressed or implied, which are not specified herein.

**CISCO**

This Agreement may only be modified by a written document executed by Cisco and Partner, subject to Section C 13.6 below.

*Part A. Definitions.*

1. **Added Value** is the non-Cisco component or portion of the total solution which Partner provides to End Users. Examples of Added Value are pre- and post-sales network design, configuration, trouble-shooting, and support and the sale of complementary products and services that comprise a significant portion of the total revenues received by Partner from an End User of Cisco Products. Partner acknowledges that telesales, catalog sales, and sales over the Internet do not include Added Value if inbound communications from the prospective End User purchaser were exclusively prompted by something other than a face-to-face interaction between Partner's sales representative and such prospective End User. Partner further acknowledges that providing financing options and/or Network Services to End Users does not constitute Added Value.

2. **Authorized Source** means a distributor that is authorized by Cisco to redistribute Products and Services within the Territory to Partner, as they are from time to time identified at http://tools.cisco.com/WWChannels/LOCATR/jsp/distributor_locator.jsp or as otherwise provided by Cisco from time to time.

3. **Cisco Services** means any services performed by Cisco for End Users, including without limitation, Product maintenance and technical support.

4. **End User** is the final purchaser or licensee that: (i) has acquired Product and/or Cisco Services for its own Internal Use and not for Resale, remarketing or distribution, and (ii) is identified as such purchaser or licensee by Reseller pursuant to Section B.3.1 below.

5. **End User Obligations** means the compliance obligations of End Users when purchasing Cisco Services in addition to End User responsibilities set out in the Services Descriptions. The End User Obligations are posted at www.cisco.com/go/servicedescriptions.

6. **Internal Use** is any business use of a Product for an End User's or Reseller's own internal use; it is to be distinguished from the definition of Resale provided below. For clarification purposes, "internal use" does *not* mean the use of a Product or Service by Reseller for the purpose of providing managed services to a third party.

7. **Marks** means the Cisco Registered Partner logo, and each of the Cisco Certified Partner marks for which Partner qualifies. Such marks and the applicable qualification requirements are included in Cisco's web site, www.cisco.com/go/partnerlogo.

8. **Network Services** means providing the End User with access to the Internet, data and voice transmission, telecommunications services related to such transmission, and the management of network equipment in connection with the foregoing.

9. **Non-Genuine Products** are any and all products: (i) to which a Mark or other Cisco trademark or service mark has been affixed without Cisco's consent; (ii) that have not been manufactured by Cisco or Cisco Technologies, Inc. ("**CTI**") or by a licensed manufacturer of either Cisco or CTI in accordance with the applicable license; (iii) are produced with the intent to counterfeit or imitate a genuine Cisco Product, or (iv) Products where any form of copyright notice, trademark, logo, confidentiality notice, serial number or other product identifier have been removed, altered, or destroyed.

**CISCO**

10. **Pre-Existing Agreement** means Cisco's System Integrator Agreement, Two-Tier Distributor Agreement or any substantially similar Cisco contract with a different title that authorizes Partner to purchase Products directly from Cisco and Resell them to End Users either directly or indirectly.

11. **Products** means those Cisco hardware products, Software, and related documentation, which Cisco makes available to an Authorized Source for Resale (in the case of Software, license grant to use such Software) to companies that have achieved Partner's level of registration, certification, and/or specialization within Cisco's Channel Partner Program described at: www.cisco.com/go/channelprograms.

12. **Professional Services** means any pre or post-sale services performed by Partner for an End User, excluding training on Cisco Products, that provide Added Value for Cisco Products. Such services include without limitation pre- and post-sales network design, configuration, trouble-shooting, and support on Cisco Products.

13. **Professional Service Providers** are Registered Partners that wish to provide their own pre and/or post-sales Professional Services to End Users.

14. **Registered Partner** means Professional Service Providers and/or Resellers that have registered using the Cisco Partner Registration Tool and accepted the terms and conditions of this Indirect Channel Partner Agreement.

15. **Registered Partner Logo** means the logo identified as the "Registered Partner Logo" and found at http://www.cisco.com/partner/WWChannels/marketing_promotions/tools/logos.

16. **Resale** includes any of the following sales or dispositions of a Product or Service: (a) transfer of title (or, for Software, a license conferring the right to use the Software, and, for Services, the entitlement to receive such Services) to the End User of such Product or Service or (b) transfer of title (or, for Software, a license conferring the right to use the Software, and, for Services, the entitlement to receive such Services) to a financial intermediary such as a leasing company, even if such leasing company is affiliated with Reseller, where the Product or Service is used by an unaffiliated End User. "Resale" as used herein does not include the purchase, license, sublicense, distribution or use of a Product or Cisco Service for the provision, to a particular customer or the general public, of any Network Services. The verb "**Resell**" means to engage in Resale.

17. **Reseller** is a Registered Partner that purchases and/or licenses Cisco Services and Products from an Authorized Source and Resells them directly to End Users.

18. **Services** means one or more of the Cisco-branded services that Cisco offers for sale on its price lists, and which are described at www.cisco.com/go/servicedescriptions/.

19. **Service Description** means the description of Cisco Services, as of the purchase date of such Cisco Services, to be made available by Cisco to End Users through Reseller, and the terms and conditions under which Cisco provides those Cisco Services. Each available Cisco Service has its own Service Description, which can be found at www.cisco.com/go/servicedescriptions/.

20. **Software** is the machine readable (object code) version of computer programs developed or marketed by Cisco and related documentation for which Cisco grants licenses for use. No 'sale' of any Software is conveyed.

**CISCO**

21. **Territory** means the country identified by Registered Partner in the applicable Partner Registration Application accepted by Cisco.

22. **Unauthorized Cisco Product** means any genuine Cisco Product or Cisco Service that Reseller purchases or acquires from, either directly or indirectly, any party other than Cisco and/or an Authorized Source or sells to any party other than an End User.  Unauthorized Cisco Products do not include Non-Genuine Products.

## Part B. Reseller Terms and Conditions.

This Part B only applies if Partner is Reselling Products and/or Cisco Services.

1. **Cisco Authorization and Resale Rules.**

   1.1   Cisco Authorization. During the term of this Agreement, Cisco hereby authorizes Reseller to purchase and/or license Cisco Services and Products only from an Authorized Source, and to resell and/or redistribute such Cisco Services and Products directly to End Users who deploy Products and receive Cisco Services within the Territory.

   1.2   No Resale Outside the Territory. Reseller agrees not to solicit Product or Service orders, engage salespersons, Resell, or establish warehouses or other distribution centers outside of the Territory.

   1.3   Sales to End Users. Reseller certifies that it is acquiring the Products and Services solely for Resale to End Users, in accordance with this Agreement.  Reseller will not Resell, license, sublicense or distribute Products or Services to other resellers of Cisco Products or Services, whether or not such other resellers are authorized by Cisco or by any other source to resell or license Products or Services. Notwithstanding the above provisions of this Section B.1.3, Reseller may Resell Products or Services to any other Cisco-authorized Reseller of Cisco Products or Services in the Territory, provided that such other Reseller is purchasing and using such Products or Services strictly as an End User and strictly for its Internal Use in the Territory.

   Prior to accepting a purchase order from an End User for Cisco Services, Reseller shall (a) refer the End User to the relevant Service Description and End User Obligations posted at www.cisco.com/go/servicedescriptions/ or (b) provide a current copy of such documents to End User.

   1.4   Non-Genuine Products or Unauthorized Cisco Products. Reseller acknowledges that the purchase and Resale of Non-Genuine Products or Unauthorized Cisco Products, or for the Resale of Services associated with any such Non-Genuine Products or Unauthorized Cisco Products, is not within the scope of this Agreement and Reseller is not entitled to the rights granted herein with respect to the resale of such Non-Genuine Products or Unauthorized Cisco Products.

   Reseller further acknowledges that destroyed, stolen or damaged Products are not entitled to Cisco Services, as more fully set forth in Cisco's published non-entitlement policies at the http://www.cisco.com/en/US/products/prod_warranties_listing.html, which are expressly incorporated into this Agreement.

   If Cisco determines that Reseller has Resold and/or redistributed Unauthorized Cisco Products purchased from non-Authorized Sources, then Cisco may, at Cisco's sole

**CISCO**

discretion: (a) audit Reseller's purchase and resale records of Cisco Product and relevant records pursuant to Section C.13.7 and/or (b) invoice Reseller for all reasonable costs incurred by Cisco in its performance of the Audit and/or (c) suspend shipments to Reseller.

For all Unauthorized Cisco Products, Cisco reserves the right to deny or withhold any Cisco Services on such Products, per the non-entitlement policies referenced above.

1.5   Renewal of Cisco Services.

(a) Sixty (60) Days Prior to Service Contract Expiration Date: At least sixty (60) days prior to the expiration date of a Cisco Service contract, Cisco, or its authorized agents, may send Cisco Service contract renewal reminder notices to Reseller and/or the identified End User, and Reseller will either: (i) initiate the Service contract renewal process with the End User and forward to Cisco the completed service contract renewal with a valid purchase order; or (ii) notify Cisco in writing of Reseller's intent to not renew the Cisco Services.

(b) At the Cisco Service Contract Expiration Date: If, upon the expiration date of the Cisco Service contract, Reseller has not renewed the Cisco Services, Cisco or its authorized agents, may contact the End User to arrange for the renewal of such Cisco Services with Cisco directly or via another Cisco-authorized Reseller.

1.6   Unsupported Products. If Reseller elects not to Resell Cisco Services at the time of Product purchase or if Product becomes unsupported due for whatever reason at some point subsequent to initial deployment, Reseller shall refer End User information, including but not limited to End User name, address and phone number to Cisco within ninety (90) days of Product becoming unsupported and authorizes Cisco to contact the End User for the express purpose of contracting directly for support services for the unsupported Product identified by Reseller.

2.   **Added Value Requirement.** Each time a Reseller resells Cisco Services or Products to an End User, Reseller will include its Added Value. Reseller must be able to demonstrate Products to prospective End Users at the End User's location and make Professional Services available for each Product Resold by Reseller.

3.   **Reseller Obligations.**

3.1   Point of Sale Reports. Reseller shall identify the complete name and address of each End User either: (i) in the applicable Product purchase order issued to the Authorized Source; or (ii) in writing within five (5) days of receiving the applicable request from Cisco or the Authorized Source. Reseller acknowledges that its provisioning to Cisco of adequate End User information is critical in order for Cisco to provide any applicable warranty and/or other service support, and to verify End User's entitlement to same. Reseller's material and unexcused failure to timely provide such End User information may be grounds for Cisco's termination of this Agreement prior to its expiration. Additionally, Reseller must comply with any other point of sale reporting requirements published by Cisco from time to time, and/or the Authorized Source(s) from which such Reseller purchases and/or licenses Cisco Services and Products.

3.2   Agreements with an Authorized Source. Reseller acknowledges that each Authorized Source may require Reseller to enter into other agreement/s with an Authorized Source. Partner acknowledges and accepts that each Authorized Source is an

CISCO

independent party who is not empowered to act on behalf of Cisco or bind or represent Cisco in any manner. Therefore, such agreement/s will be considered executed only between Reseller and each Authorized Source with which Reseller has entered into such agreements, except to the extent that such agreements specifically identify Cisco as a third party beneficiary of such agreements. For the avoidance of doubt, this Agreement shall not constitute a sale, purchase or distribution agreement with Cisco. Any arrangements between the Reseller and an Authorized Source with respect to the sale, purchase or distribution of Cisco Products and/or Services will need to be defined in separate, specific agreements between Reseller and each Authorized Source selected by Reseller.

3.3   <u>Additional Requirements.</u> Reseller acknowledges that Cisco may require Reseller to achieve particular requirements, for example particular specializations, before permitting any Authorized Source to make available particular Products to such Reseller. Also, Reseller acknowledges that Resale of Products and Cisco Services to particular End Users with which Cisco has contracted directly (for example, state governments) may require Reseller to satisfy additional requirements and to enter into supplemental agreements with Cisco.

3.4   <u>No Stocking of Product</u>. Reseller may not stock Products, and may not order Products without a valid End User purchase order, as set forth in Section 3.1 above. This Section 3.4 does not apply to Resellers in Japan.

4.   **Government Sales.**

4.1 For Government Sales in which Registered Partner's Territory does <u>not</u> include the United States:

4.1.1   <u>Schedule Contracts.</u> Reseller shall not, without the express prior written consent of Cisco, distribute or sell, either directly or indirectly, any Products to any agencies, departments or entities (whether or not within the Territory) which either form part of, or are subject to the procurement requirements of, the federal government or any state or municipal government of any of the United States of America (including, for example, but without limitation, embassies, military bases, etc).

4.1.2   <u>Government Terms.</u> Cisco does not accept any government flow-down provisions, whether for Resale or Internal Use. Further, Cisco will not provide any government-required representations or certifications to Reseller or any of Reseller's End Users.

4.1.3   Notwithstanding the foregoing, Reseller may Resell Products and Services to federal, state, provincial and local governments within the Territory, subject to this Agreement and the applicable Cisco qualification and eligibility requirements, including Cisco's aforementioned disclaimers of supply representations or government flow-downs.

4.2 For Government Sales in which Registered Partner's Territory does include the United States:

4.2.1   <u>Schedule Contracts</u>. With respect to US General Services Administration ("**GSA**"), California Multiple Award Schedule ("**CMAS**"), and other schedule contracts, Reseller is prohibited from placing Cisco Products and Services on

**CISCO**

Reseller's GSA, CMAS, or any other schedule contract(s) without the express written approval from an authorized representative of Cisco's Federal Channels organization.

4.2.2 <u>Government Terms</u>. Cisco does not accept any government flow-down provisions, including but not limited to, the United States Government Federal Acquisition Regulations (**"FARs"**) and its supplements, Defense FARs, or NASA FARs, whether for Resale or Internal Use. Further, Cisco will not provide any government-required representations or certifications to Reseller or any of Reseller's End Users.

4.2.3 Reseller acknowledges that the Trade Agreements Act, 19 U.S.C. §2511 et seq., and its implementing regulations (collectively, the **"TAA"**) limit the ability of the federal government to purchase items produced outside the United States and certain designated countries. Reseller acknowledges that not all Cisco items are produced in the United States or designated countries and that only certain items specifically identified by Cisco (**"Designated Country Items"**) are certified as being produced in the United States or designated countries. If Reseller undertakes to sell items other than Designated Country Items to the federal government, Reseller accepts sole responsibility for ensuring that such sales may be made to the federal government.

4.2.4 Notwithstanding the foregoing, Reseller may Resell Products and Services to federal, state, provincial and local governments within the Territory, subject to this Agreement and the applicable Cisco qualification and eligibility requirements, including Cisco's aforementioned disclaimers of supply representations or government flow-downs.

5. **Pricing.**

5.1 <u>Reseller Prices.</u>  The prices Reseller pays for Cisco Services and Products will be set unilaterally by the Authorized Source from which Reseller purchases such Cisco Services and Products.  Reseller is free to unilaterally determine its Resale prices.

5.2 <u>Special Pricing.</u> Any commitment from Cisco to provide special pricing will only occur through the provision of an approved Deal ID.  Unless you are notified in writing, including by email, of the Deal ID in relation to special pricing, then any other notification of pricing is indicative only, and is not binding upon Cisco.

6. **Reseller's Distribution Rights.**

6.1 <u>Grant of Rights.</u> During the term of this Agreement, Cisco grants to Reseller a limited, nonexclusive, revocable license to receive from an Authorized Source and distribute to End Users located in the Territory all proprietary rights embodied in or contained in any Product. Reseller may continue such distribution for thirty (30) days following the expiration of this Agreement. Any distribution of Products containing Cisco proprietary rights (including, without limitation, all Software) outside the scope permitted by Section B.1 of this Agreement is prohibited to the extent permitted by law. Cisco Products are subject to license terms which impose additional restrictions on the use, copying, or distribution of Software.

6.2 <u>Rights Reserved by Cisco.</u> Except for the limited license provided to Reseller in the preceding Section B.6.1, Cisco reserves all right, title, and interest in and to each

CISCO

proprietary right embedded in or contained in any Product. Reseller acknowledges that, except as provided in Section B.6.1 above, it shall not copy Software for the benefit of, or distribute any Software to, any other person or entity, including, without limitation, other resellers or Registered Partners.

6.3   <u>License Restrictions and Conditions.</u> Reseller will not remove, alter, or destroy any form of copyright notice, trademark, logo, or confidentiality notice provided with any Product. Reseller will not copy or redistribute any item of Software except as specifically permitted in this Section B.6. Reseller agrees that it will not redistribute Software (including Software received as part of a Product) received from any source other than Cisco or an Authorized Source. Reseller will not translate, reverse compile or disassemble the Software, and will transfer to each End User to which Reseller resells Products all end-user license terms and end-user documentation provided by Cisco and accompanying such Products. A current copy of such end-user license terms is              available              at              the              following              URL: http://www.cisco.com/univercd/cc/td/doc/es_inpck/cetrans.htm

## Part C. General Terms and Conditions

1.   **Partner Benefits.** Subject to Partner's compliance with its obligations under this Agreement, Partner shall be entitled to the following benefits:

1.1   <u>Cisco.com Access.</u> Partner shall have partner-level access to the information and tools on the Cisco.com web site (previously referred to as "CCO"), provided Partner's use of such information is subject to the terms and conditions of Cisco.com (including, without limitation, Cisco's software license terms associated with Partner's downloading of any software from Cisco.com) and the Confidentiality obligations of this Agreement set forth in Section C.4 below;

1.2   <u>Partner Locator Listing.</u> Unless Partner tells Cisco in writing that it may not do so, Cisco may include Partner in the Cisco Partner Locator tool within the Cisco.com web site;

1.3   <u>Registered Partner Logo.</u> Subject to Section C.3 below, Partner shall have the right to use the Registered Partner Logo to promote the sale of Products, Services and Professional Services to End Users within the Territory; and

1.4   <u>Partner E-Learning Access.</u> Partner shall have the right to register on Partner E-Learning Connection, to the extent Cisco makes such service available to Partner within the Territory.

2.   **Term and Termination.**

2.1   <u>Term.</u> This Agreement will expire upon the later of (a) one (1) year after the date it is accepted by Cisco, unless extended by written agreement of both parties or sooner terminated pursuant to this Agreement, or (b) the date that the Partner's most recent certification or specialization expires.

2.2   <u>Termination.</u>   Within the first thirty (30) days following the Effective Date of this Agreement, Cisco may terminate this Agreement for convenience with no notice.  After the first thirty (30) days following the Effective Date of this Agreement, this Agreement may be terminated for convenience, for any reason or no reason, by either party upon no less than thirty (30) days prior written notice to the other. This Agreement may be terminated by Cisco for cause at any time upon Partner's material breach of the

ı|ı.ı|ı.
CISCO

Agreement, on ten (10) days notice, except that this Agreement may be terminated by Cisco immediately upon Partner's breach of any provision of Sections B.1.2, B.1.3, B.2, B.6, C.3, C.4, C.9 and C.12.

2.3   Effect of Termination. Upon the termination or expiration of this Agreement, Partner's rights to purchase Cisco Services and Products from any Authorized Source shall immediately terminate, Cisco shall discontinue all Partner benefits listed in Section C.1 above, and Partner shall immediately (a) cease to represent itself as a Cisco Registered Partner, and (b) cease its use of any of the Marks.

3.   **Use of the Registered Partner Logo and other Marks.**

3.1   Cisco grants to Partner, during the term of this Agreement, the right to use the Marks, including the Registered Partner Logo, in the Territory, solely to promote the Resale of Cisco Products and Cisco Services to End Users, provided that such Resales are pursuant to all the terms and conditions of this Agreement. Partner shall not affix any Cisco trademarks or service marks to any products. Partner's usage of the Marks must conform to the Guidelines provided at the following URL: www.cisco.com/go/partnerlogo. Partner's usage of the Marks must also conform to the Trademark Usage Policy set out at the following URL:http://www.cisco.com/logo/trademark.pdf.

3.2   Partner shall not acquire, use, promote or Resell Non Genuine Products. Partner will not remove, alter, or destroy any form of copyright notice, trademark, logo, confidentiality notice, serial number or other product identifier provided with any Product.

3.3   If Partner acquires, uses, promotes or Resells Non-Genuine Products, Cisco may take one or more of the following actions, at Cisco's discretion: (i) require Partner, within ten days of Cisco's request, to recall and destroy all Non-Genuine Products that Partner has sold to End Users and replace such products with legitimate, equivalent Products, (ii) require Partner, within five days of receiving Cisco's written request, to provide Cisco with all details related to Partner's acquisition of all Non-Genuine Products, including without limitation, its suppliers, shipping details and all buyers to whom Partner resold Non-Genuine Products; (iii) decline the provisioning of any kind of service support for such Non-Genuine Products; and/or (iv) immediately terminate this Agreement pursuant to Section C.2.

4.   **Confidentiality and Publicity.** In the event that Partner receives from Cisco information that is marked as confidential, Partner shall protect that information using the same degree of care as it uses to protect its own sensitive business information, but not less than a reasonable degree of care, and shall not disclose such information to any third party without Cisco's prior written consent. Partner shall only use such information in connection with the promotion and Resale of Products and Services. Upon the termination or expiration of this Agreement, Partner will promptly return any confidential information provided by Cisco to Partner. Except as expressly provided in this Agreement, neither Cisco nor Partner will issue press releases or make other public announcements that identify Partner as an authorized or registered Partner without the express written consent of the other party. In addition, Partner shall at no time (nor cause any third party to) take any action, publish or otherwise communicate anything which is or may be detrimental to the business reputation of Cisco.

5.   **License to Information.** Information made available to Partner through Cisco.com is made available subject to the terms contained in the Cisco.com "Important Notices" and any

ılıılı.
**CISCO**

additional terms as Cisco may notify Partner of through Cisco.com. Information provided through Cisco.com may be used only in connection with Partner's promotion and Resale of Products and Services.

6. **Limited Warranty / Warranty Disclaimer.**

6.1 <u>Warranty.</u> The only warranty Cisco provides with respect to any Product is the written limited warranty statement provided with that Product, or if no warranty statement is provided with a Product, the Limited Warranty Statement available at the following URL:

http://www.cisco.com/en/US/products/prod_warranties_listing.html.

6.2 **Disclaimer.** EXCEPT AS SPECIFIED IN THE LIMITED WARRANTY STATEMENT SPECIFIED IN SECTION C.6.1 ABOVE, ALL EXPRESS OR IMPLIED CONDITIONS, REPRESENTATIONS OR WARRANTIES INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OR CONDITION OF MERCHANTIBILITY, FITNESS FOR A PARTICULAR PURPOSE (EVEN IF KNOWN TO CISCO), NONINFRINGEMENT, SATISFACTORY QUALITY OR ARISING FROM A COURSE OF DEALING, LAW, USAGE, OR TRADE PRACTICE ARE HEREBY EXCLUDED TO THE GREATEST EXTENT ALLOWED BY APPLICABLE LAW.   TO THE EXTENT AN IMPLIED WARRANTY CANNOT BE EXCLUDED, SUCH WARRANTY IS LIMITED TO THE 90-DAY PERIOD PROVIDED IN THE LIMITED WARRANTY STATEMENT SPECIFIED IN SECTION C.6.1 ABOVE.   THIS DISCLAIMER AND EXCLUSION SHALL APPLY EVEN IF THE EXPRESS WARRANTY SET FORTH ABOVE FAILS OF ITS ESSENTIAL PURPOSE.

PARTNER SHALL NOT MAKE ANY WARRANTY COMMITMENT BEYOND THE LIMITED WARRANTY REFERENCED IN SECTION C.6.1 ON CISCO'S BEHALF. PARTNER AGREES TO INDEMNIFY CISCO AND HOLD CISCO HARMLESS FROM ANY WARRANTY MADE BY PARTNER BEYOND THE LIMITED WARRANTY REFERENCED IN SECTION C.6.1.

7. **Limitation of Liability and Consequential Damages Waiver.**   The limits of liability for this Agreement are set forth as follows:

7.1. If this Agreement is governed by California, Japanese, or Canadian law, as set forth in Section C.13.1, below, the following Sections C.7.1.1 and C.7.1.2 will apply:

7.1.1. **Limitation of Liability.**  NOTWITHSTANDING ANYTHING ELSE HEREIN, ALL LIABILITY OF CISCO AND ITS SUPPLIERS FOR CLAIMS ARISING UNDER THIS AGREEMENT OR OTHERWISE SHALL BE LIMITED TO THE MONEY PAID BY PARTNER TO ITS AUTHORIZED SOURCE FOR CISCO SERVICES AND PRODUCTS IN THE THREE (3) MONTHS PRECEDING THE EVENT OR CIRCUMSTANCES GIVING RISE TO SUCH LIABILITY. THIS LIMITATION OF LIABILITY IS CUMULATIVE AND NOT PER-INCIDENT.

7.1.2. **Waiver of Consequential Damages.** IN NO EVENT SHALL CISCO OR ITS SUPPLIERS BE LIABLE FOR ANY INCIDENTAL, SPECIAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL DAMAGES, LOST REVENUE, LOST PROFITS, OR LOST OR DAMAGED DATA, WHETHER ARISING IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, EVEN

ı|ıı.ı|ı.
**CISCO**

IF CISCO OR ITS SUPPLIERS HAVE BEEN INFORMED OF THE POSSIBILITY THEREOF.

7.2. If this Agreement is governed by the laws of England, as set forth in Section C.13.1 below, the following Sections C.7.2.1, C.7.2.2, and C.7.2.3 will apply:

    7.2.1.  <u>Limitation of Liability</u>. The aggregate total liability of Cisco and its suppliers under or in connection with this Agreement, whether in contract, tort (including, without limitation, negligence) or otherwise, shall be limited to the higher of (i) 10.000 USD, or (ii) price paid by Partner to its Cisco Distribution Partner (or Authorized Channel) for Cisco Products and Services in the three (3) month period prior to the event or circumstances giving rise to the liability.

    7.2.2.  <u>Waiver of Consequential Damages</u>. In no event shall Cisco or its suppliers be liable for any of the following losses or damage (whether such losses were foreseen, foreseeable, known or otherwise): loss of use, interruption of business, loss of actual or anticipated profits (including, without limitation, loss of profit on contracts), loss of revenue, loss of the use of money, loss of anticipated savings, loss of opportunity, loss of goodwill, loss of reputation, loss of, damage to or corruption of data, or indirect, special, incidental or consequential loss or damage of any kind (including, without limitation, where such loss or damage is also of a type or category expressly specified in this Section C.7.2) regardless of the form of action, whether in contract, tort (including, without limitation, negligence), strict liability or otherwise. Such liabilities will be exclusively governed by the specific agreements between Partner and any Cisco Distribution Partner (or other Authorized Channel) of its choice, under which specific Cisco Products and/or Services are purchased.

    7.2.3.  Notwithstanding C.7.2.1 or C.7.2.2, nothing in this Agreement shall limit Cisco's or its suppliers' liability to Partner for (1) personal injury or death caused by its negligence, (2) Cisco's liability in the tort of deceit or for fraud, (3) any breach of the obligations implied by section 12 Sale of Goods Act 1979 or section 2 Supply of Goods and Services Act 1982 or (4) any liability which cannot be excluded under applicable law.

8. **Third Party Rights.** To the extent permitted by law, no person or entity who is not a party to this Agreement shall be entitled to enforce or benefit from any of this Agreement's terms, including but not limited to doing so under the Contracts (Rights of Third Parties) Act of 1999.

9. **Export Restrictions and Controls.**

    9.1  <u>Applicability.</u> Resellers hereby acknowledge that the products and technology or direct products thereof ("Products and Technology"), supplied by Cisco under this Agreement are subject to export controls under the laws and regulations of the United States (U.S.) and any other applicable countries' laws and regulations. Resellers shall comply with such laws and regulations governing export, re-export, transfer and use of Cisco Products and Technology and will obtain all required U.S. and local authorizations, permits, or licenses. Cisco and Resellers each agrees to provide the other information, support documents, and assistance as may reasonably be required by the other in connection with securing export authorizations and/or producing government required reports. Information regarding compliance, export, re-export and transfer laws may be

**CISCO**

located               at               the               following               URL:
http://www.cisco.com/web/about/doing_business/legal/global_export_trade/index.html

Resellers agree not to use any export and/or re-export licenses or authorizations that Cisco or its affiliates holds for securing their own activities unless specifically authorized by Cisco's Global Export Trade and where legally compliant. Resellers agree to institute and maintain an effective internal export compliance program to ensure compliance with their export and re-export activities.

9.2   Government/Military Sales. Resellers hereby certify that none of the products, services, or technical data supplied by Cisco under this Agreement will be knowingly sold or otherwise transferred to, or made available for use by or for, any government or military end-users or in any government or military end-use located in or operating under the authority of any country not identified in Supplement No. 1, Country Group A:1 to Part 740 of the EAR without US or other country's export authorizations.

9.3   Resellers also certify that none of the products, services or technical data supplied by Cisco under this Agreement will be knowingly sold or otherwise transferred to, or made available for use by or for, any entity that is engaged in the design, development, production or use of nuclear, biological or chemical weapons or missiles or is otherwise restricted from receiving Cisco products without US or other country's export authorizations.

9.4   Trade Data. Resellers may locate ECCN (Export Control Classification Number), HTS (Harmonized Tariff Schedule), French DCSSI Authorization, Encryption Strength, Encryption Status and CCATS (Commodity Classification Automated Tracking System) number at the following URL: http://tools.cisco.com/legal/export/pepd/Search.do

9.5   Record Keeping. Resellers agree to maintain a record of sales, imports, exports and re-export of Cisco Products and Technology in accordance with the Reseller's records retention programs in the appropriate geographies but at least for five years.

9.6   Obligation. Reseller's obligation under this Article shall survive the expiration or termination of this Agreement.

## 10. Obligation to Maintain Contacts.

10.1   Requirement to Maintain. Beginning September 20, 2004, and at all times thereafter, Partners are required to have at least one valid contact associated to their company at all times in the Cisco Channel Partner Database.

10.2   Valid Contact Information. For Partner's contacts to be "valid," its contact profiles in Cisco's Channel Partner Database ("**CPD**"), as maintained via the Partner Self Service ("**PSS**") data management tool, must include a First Name, Last Name, Site Address, and Email Address.  Cisco will remove the Partner from the CPD if the last valid contact associated with the company is removed from the CPD using the PSS tool.  To regain Partner status, a user from the company must complete Partner registration as a new prospective Partner.

10.3   Reservation of Rights. Cisco reserves the right to remove any Partner without sufficient valid contacts at such time, and using such means, as Cisco may determine in its sole discretion.   Whereas Cisco may choose, at its option, to provide certain forms of notification regarding the removal of a Partner's status as a result of insufficient or

CISCO

invalid contacts in the PSS, Cisco is not under any obligation to provide notification of any kind regarding any such removal.

10.4   Effect of Partner Removal.   If Cisco removes the Partner from the CPD in accordance with the foregoing, or Partner's status as a Partner is otherwise removed from the CPD, this Agreement shall terminate concurrently.

11. **Entitlement.**   Partner acknowledges that Cisco has the right to verify an End User's entitlement to receipt of Services, and that End User is entitled to receive support services only on Product for which Cisco has been paid the applicable license and support fees.

12. **Compliance with Laws, including Anti-Corruption Laws.** In connection with the Resale or distribution of Cisco Products or Services, or otherwise in carrying out its obligations under this Agreement, Partner represents and warrants the following:

12.1   Partner will comply with all country, federal, state and local laws, ordinances, codes, regulations, rules, policies, licensing requirements, regulations and procedures, including, without limitation, such laws and regulations related to recycling or take-back programs for packaging, Resale or use of Products, the use of Products under telecommunications laws/regulations, and all applicable anti-corruption laws, including the U.S. Foreign Corrupt Practices Act ("**FCPA**") (collectively, the "**Applicable Laws**"); Partner can find more information about the FCPA at the following URL: http://www.usdoj.gov/criminal/fraud/docs/dojdocb.html,   or   by   contacting publicsectorcompliance@cisco.com.

12.2   Partner shall not take any action or permit or authorize any action which may render Cisco liable for a violation of Applicable Laws;

12.3   Partner will not use money or other consideration paid by Cisco for any unlawful purposes, including any purposes violating the Applicable Laws, such as direct or indirect payments, for the purpose of assisting Cisco in obtaining or retaining business, to any of the following:

12.3.1   government officials (including any person holding an executive, legislative, judicial or administrative office, whether elected or appointed, or of any public international organization, such as the United Nations or World Bank, or any person acting in any official capacity for or on behalf of such government, public enterprise or state-owned business);

12.3.2   political parties or party officials;

12.3.3   candidates for political office; or

12.3.4   any person, while knowing that all or a portion of such money or thing of value will be offered, given or promised, directly or indirectly, to any of the above-identified persons or organizations.

12.4   Upon request by Cisco, Partner will require that its own subcontractors, consultants, agents or representatives execute a written FCPA Compliance Statement containing substantially similar representations as are contained in this section;

**CISCO**

12.5 Partner's record keeping obligations, set forth in the "Audit" provision herein, shall equally apply to Partner's representations and warranties in this section, and Cisco's audit rights, as set forth herein, apply to Partner's compliance with Applicable Laws;

12.6 In no event shall Cisco be obligated under this Agreement to take any action or omit to take any action that Cisco believes, in good faith, would cause it to be in violation of any laws of the Territory(ies) identified in this Agreement or the Applicable Laws

12.7 The owner(s), directors, officers and employees of Partner's business are not government officials or employees (at any level of government);

12.8 The owner(s), directors, officers and employees of Partner's business are not employees of Cisco (including any of its affiliated companies);

12.9 Partner has not been formally charged with, convicted of, or plead guilty to, any offense involving fraud or corruption;

12.10 Partner has not been listed by any government or public agency (such as the United Nations or World Bank) as debarred, suspended, or proposed for suspension or debarment or otherwise ineligible for government procurement programs;

12.11 Partner has not offered to pay, nor has Partner paid, any political contributions to any person or entity on behalf of Cisco;

12.12 If Partner is a non-governmental entity, it will notify Cisco in writing if any of its owners, partners, principals, officers, or employees are or become during the term of this Agreement officials, officers or representatives of any government, political party or candidate for political office outside the United States and are responsible for a decision regarding obtaining or retaining business for Cisco Products or Services by such government.  Partner will also promptly inform Cisco if any other portion of the statements set forth in sections 12.7 through 12.11 above changes.

12.13 Notwithstanding any other provision in this Agreement, Cisco may terminate this Agreement immediately upon written notice if Partner breaches any of the representations and warranties set forth in this section.  Partner will indemnify and hold harmless Cisco for any violation by Partner of any Applicable Laws;

12.14 Partner has read and agrees to act consistently with Cisco's Policy re: Compliance with Global Anticorruption Laws by Cisco's Partners, published at http://www.cisco.com/legal/anti_corruption.html, or available by contacting publicsectorcompliance@cisco.com.  Cisco strives to maintain the highest standards of business integrity; any cause for concern regarding any business practice should be reported to Cisco at ethics@cisco.com, or by calling Cisco's Helpline toll free number in North America 1-877-571-1700 or the following worldwide number (reverse calling charges to Cisco), 001-770-776-5611.

12.15 Partner shall use its best efforts to regularly inform Cisco of any requirements under any Applicable Laws that directly or indirectly affect this Agreement, the sale, use and distribution of Products or Services, or Cisco's trade name, trademarks or other commercial, industrial or intellectual property interests, including, but not limited to, certification or type approval of the Products from the proper authorities in the Territory;

ılıılı.
**CISCO**

12.16 Additionally, Partner shall comply, and notify end users of their obligations to comply, with all applicable Cisco published policies, including Software Transfer Policy, Used Equipment Policy, as published by Cisco and as amended from time to time. Partner shall promptly notify Cisco of any failure by any end user to comply with any of the foregoing policies that comes to Partner's attention.

## 13. Miscellaneous.

13.1 <u>Choice of Law.</u> The validity, interpretation, and enforcement of this Agreement shall be governed as follows:

(a)   If Partner's principal place of business is located in Canada, the validity, interpretation, and enforcement of this Agreement shall be governed by the domestic laws of the Province of Ontario and the laws of Canada applicable as if performed wholly within the province and without giving effect to principles of conflicts of laws. Each party submits itself to the jurisdiction of the Ontario and Federal courts within the Province of Ontario. The parties specifically disclaim the application of the UN Convention on Contracts for the International Sale of Goods to the interpretation or enforcement of this Agreement.

(b)   If Partner's principal place of business is located in Japan, the validity, interpretation, and enforcement of this Agreement shall be governed by the domestic laws of Japan, without giving effect to principles of conflicts of laws. Each party submits itself to the jurisdiction of the Tokyo District Court of Japan.

(c)   If Partner's principal place of business is located in the Emerging Markets – West or the United States, the validity, interpretation, and enforcement of this Agreement shall be governed by the domestic laws of the State of California, United States of America, as if performed wholly within the State and without giving effect to principles of conflicts of laws, and the State and Federal courts of California shall have exclusive jurisdiction over any claim arising hereunder, except as expressly provided below. Notwithstanding the foregoing, either party may seek interim injunctive relief in any court of appropriate jurisdiction with respect to any alleged breach of such party's proprietary rights. The parties specifically disclaim the application of the UN Convention on Contracts for the International Sale of Goods to the interpretation or enforcement of this Agreement.

(d)   If Partner's principal place of business is located in the Asia Pacific region (excluding Australia and Japan), or the Emerging Markets – Central/East, the validity, interpretation, and enforcement of this Agreement shall be governed by the laws of England, without giving effect to principles of conflicts of laws. Cisco and Partner accept the exclusive jurisdiction of the English courts, provided that either party may bring an action before any court of appropriate jurisdiction for interim injunctive relief for protection of intellectual property rights and confidential information. The parties specifically disclaim the UN Convention on Contracts for the International Sale of Goods.

13.2 <u>Assignment.</u> Neither this Agreement, nor any rights under this Agreement, may be assigned by Partner without the express prior written consent of Cisco. Any attempted assignment in violation of the preceding sentence shall immediately terminate the Agreement and be without legal effect.

CISCO CONFIDENTIAL

CISCO

13.3 <u>Relationship of the Parties; No Partnership.</u> Each party to this Agreement is an independent contractor. This Agreement does not create any agency, partnership, joint venture, employment or franchise relationship. Furthermore, no labor relationship between Cisco and Partner employees is created hereby. Partner shall indemnify and hold Cisco harmless of any claim or judicial action whatsoever from any Partner employee. Neither party has the right or authority to, and shall not, assume or create any obligation of any nature whatsoever on behalf of the other party or bind the other party in any respect whatsoever. Notwithstanding the use of the term "Partner" in this Agreement, the parties do not intend to create any legal relationship of partnership between them, and neither will assert to any third party or otherwise claim that such a legal relationship exists between them.

13.4 <u>Survival.</u> Part A and Sections B.3, B.4, B.6.2, B.6.3, C.2, C.3.3 and C.4 through C.13 shall survive the expiration or termination of this Agreement.

13.5 <u>Notices.</u> All notices required to be provided under this Agreement shall be provided (a) by Partner, to contract-notice@cisco.com, and (b) by Cisco, to the electronic mail address provided by Partner with its Partner Registration application. Notices shall be deemed received one business day after being sent by e-mail.

13.6 <u>Enforceability.</u> Partner agrees that the electronic mail address it has provided corresponds to a person that has the capacity and authority to execute this Agreement and any amendments on behalf of Partner. Partner and Cisco each waive any defense to the validity or enforceability of this Agreement arising from the electronic submission and electronic acceptance of this Agreement by Partner. If Partner needs a physical document evidencing the Agreement, Partner may (i) print the accepted Agreement or (ii) request from Cisco a signed version, in which case Reseller shall print and return to Cisco two (2) printed, executed originals of the Agreement. Such printed originals shall not be deemed accepted by Cisco unless Cisco returns one (1) counter-signed original to Partner.

13.7 <u>Audit</u>. Partner shall keep full, true, and accurate records and accounts, in accordance with generally-accepted accounting principles, of each Cisco Service and Product purchased and Resold, including information regarding compliance with Cisco marketing and sales programs, Software usage and transfer, End User names and locations, and Cisco Product exportation. Partner shall make these records available for audit by Cisco upon fifteen (15) days prior written notice, during regular business hours, at those locations where Partner may maintain relevant records. Partner shall bear all costs incurred by Cisco in the performance of any audit which discloses any material breach of this Agreement. Partner additionally acknowledges that from time to time Cisco or its independent auditors may conduct additional specific audits with the purpose of monitoring and ensuring compliance by Partner and its Authorized Source with Cisco's policies and applicable laws. Said audits may include, without limitation, investigations in order to prevent the acquisition, use, promotion or Resale of Non-Genuine Products and/or Unauthorized Cisco Products. When requested, Partner shall collaborate with Cisco's auditors and provide accurate and truthful information. In all cases, Partner agrees to bear, and/or promptly repay to Cisco, all costs, fees and expenses, incurred by Cisco in the performance of any such audit and/or investigation that discloses any material breach of this Agreement by Partner, including without limitation sub-sections B.1.2, B.1.3, B.1.4, B.5.2, C.3, and C.12. Partner acknowledges and accepts that, in addition to the above audit rights, Cisco may directly contact any End User at anytime in order to verify and/or inform End Users about Partner's

**CISCO**

compliance or non-compliance with this Agreement, including but not limited Sections B.1, B.5, C.3 and C.12, and Cisco's policies.

13.8  URLs. Partner hereby confirms that it has the ability to access, has accessed, has read and agrees to, the information made available by Cisco at all of the world wide web sites/URLs/addresses/pages referred to anywhere throughout this Agreement. Partner acknowledges that Cisco may modify any URL address or terminate the availability of any information at any address without notice to Reseller.

13.9  Other Remedies. All Cisco remedies specified in this Agreement shall be in addition to, and shall in no way limit, any other rights and remedies that might be available to Cisco, all of which Cisco hereby expressly reserves.

13.10 Severability. In the event that any of the terms of this Agreement become or are declared to be illegal or otherwise unenforceable by any regulatory body or court of competent jurisdiction, such term(s) shall be null and void and shall be deemed deleted from this Agreement. All remaining terms of this Agreement shall remain in full force and effect. Notwithstanding the foregoing, if this paragraph becomes applicable and, as a result, the value of this Agreement is materially impaired for either party, as determined by such party in its sole discretion, then the affected party may terminate this Agreement by written notice to the other.

ıılııılıı
**CISCO**

**EXHIBIT D**

## DISTRIBUTOR DIRECT SUPPORT EXHIBIT

**1.0    DEFINITIONS**

1.1    "Bug Fix" means an error correction, patch or workaround for the Software, which Cisco provides to DISTRIBUTOR.

1.2    "CCO" means Cisco Connection Online, Cisco's online information web server.

1.3    "Customer"      means      End      Users      and      Resellers.

1.4    "End User" means final purchaser or licensee who has acquired Products for its own internal    use    and    not    for    resale,    remarketing    or    redistribution.

1.5    "Hardware" means tangible Cisco Product made available to DISTRIBUTOR.

1.6    "Major Release" or "New Release" means a release of Software which is designated by Cisco as a change in the ones digit in the Software version number [(x).x.x].

1.7    "Product"      means      both      Hardware      and/or      Software.

1.8    "Reseller" means an authorized reseller of DISTRIBUTOR who has entered into a written contract with DISTRIBUTOR containing the requirements set forth in this Agreement.

1.9    "RMA"      means      Return      Material      Authorization.

1.10   "Software" means the machine-readable object code software programs licensed by Cisco.

**2.0    CISCO RIGHTS AND OBLIGATIONS**

For Products purchased under this Agreement, Cisco provides the services described below. Unless specified otherwise, the following services are provided solely to DISTRIBUTOR as backup to its support staff.  Cisco shall have no obligation to furnish any assistance, information    or    documentation    to    Customers    with    respect    to    Product.

2.1 <u>CCO Access</u>.  Cisco will provide DISTRIBUTOR-level access to CCO which provides DISTRIBUTOR with technical and general information on Cisco Products.

2.2 <u>Pre-Implementation Product Support</u>.  Cisco shall provide pre-implementation assistance (i.e., information related to Product use, configuration/installation assistance) by reply phone, electronic mail and facsimile.

2.3 <u>Warranty Support</u>.  For the duration of the Cisco warranty period, Cisco will provide the following to DISTRIBUTOR:

2.3.1    *Bug Fixes*.   When required, Cisco will provide new Software to DISTRIBUTOR to correct a problem, or provide a network-bootable Software image, as determined by Cisco.

CISCO

2.3.1.1 Service from Cisco is limited to supported Software releases. Cisco supports each New Release for a period of thirty-six (36) months from the first commercial shipment of that release. Cisco, in meeting any support obligations, may require an upgrade to a supported release.

2.3.1.2 Duplication and Distribution Rights. Cisco grants DISTRIBUTOR the right to duplicate Bug Fixes provided hereunder for distribution to Authorized Sources or to Resellers to distribute to its End Users who have a contract with such Reseller, provided the End User is currently                 licensed                 to                 use                 the                 Software.

2.4 Credit upon Return of Product. Products accepted by DISTRIBUTOR during the Cisco warranty period may be returned to Cisco for credit equal to the net purchase price or license fee of the individual Product price paid by DISTRIBUTOR, at Cisco's sole option.

2.5 Cisco Brand Services Option. Cisco will make available for purchase by DISTRIBUTOR, all appropriate Cisco-brand service products for DISTRIBUTOR's internal use and for resale to Authorized Sources. This option to resell Cisco-brand services whereby services are delivered directly by Cisco to the End User is available in accordance with Cisco's then-current Cisco-brand packaged service resale program. Availability of Cisco-brand services is subject to geographic limitations. For additional information on where such services are available for resale and the process for reselling Cisco brand services, refer to the information which accompanies the Cisco brand services product or the small/medium business website on CCO at "http://www.cisco.com".

## 3.0   DISTRIBUTOR RIGHTS AND OBLIGATIONS

3.1 Spare Parts. DISTRIBUTOR shall maintain sufficient spare parts inventory to support its Customer base for a one month period under normal circumstances, including providing warranty service as described in Section 3.2. DISTRIBUTOR shall maintain adequate manpower and facilities to assure prompt handling of orders and shipments for Products.

3.2 Warranty Service. DISTRIBUTOR shall provide to Authorized Source, at no charge, all warranty service for a minimum of the warranty period set forth in the published Product warranty provided with the original Product. Where the Authorized Source resells to an End User, warranty shall commence upon shipment to the End User. Where the Authorized Source resells to another Authorized Source, warranty shall commence upon shipment to the second Authorized Source. DISTRIBUTOR will ensure warranty service, which consists of the following Software and Hardware replacement service, is provided to End Users (or, as the case may be, second Authorized Source):

3.2.1 *Software Service.* DISTRIBUTOR will use reasonable efforts to provide Bug Fixes to Authorized Sources for distribution to the End User (or, as the case may be, second Authorized Source) during the warranty period. DISTRIBUTOR will ensure End User (or, as the case may be, second Authorized Source) is using the latest release of Software.

3.2.2 *Hardware Service.* DISTRIBUTOR will ship replacement parts to Authorized Source and shall require Authorized Source to meet the replacement obligations as set forth in the then-current published Product warranty applicable to the particular Product sold to End User (or, as the case may be, second                 Authorized                 Source).

CISCO

3.3 <u>Returns Coordination</u>. For Product returned to Cisco for warranty credit or replacement at Cisco's sole option, DISTRIBUTOR will coordinate the return of all failed parts, freight and insurance prepaid, to the Cisco designated location in accordance with Cisco's RMA procedure.

   3.3.1   DISTRIBUTOR will ensure all Products are properly packaged prior to being shipped, and will use reasonable efforts to provide a reason for the return of each Product. Product returned to Cisco will conform in quantity and serial number to the RMA request.

   3.3.2   DISTRIBUTOR shall tag each Product returned with the RMA transaction number and a brief description of the problem.

3.4 <u>End User Support</u>. DISTRIBUTOR shall provide competent technical support staff to support the Products or will ensure that End User is able to receive the necessary support either by its Reseller or by making available the resale of Cisco brand services.

   3.4.1   *Reseller Frontline Support*. DISTRIBUTOR will have a dedicated, published phone line for frontline support and use best efforts to ensure that its Resellers are provided high quality frontline support. Frontline support means call receipt and entitlement verification, call screening, problem identification and diagnosis, and where necessary, Product defect determination. This includes remedial support via phone, facsimile, and electronic mail depending upon geographic capabilities, as well as honoring the Cisco Product warranty claims by the End Users. DISTRIBUTOR is responsible for any claims arising from failure by its Resellers to provide this support. This is subject to Section 16.2 ("Audit").

   3.4.2   *Resale of Cisco Brand Services*. Cisco's direct services may be purchased in accordance with Cisco's then-current packaged service resale program.

      3.4.2.1   Where such services are available from Cisco, DISTRIBUTOR will offer for purchase by its Resellers or other Authorized Sources, all appropriate Cisco brand service products through its normal products availability process.

      3.4.2.2   For any Products purchased by DISTRIBUTOR, which are not included in Cisco's Wholesale Price List Latin America, DISTRIBUTOR is required to purchase Cisco brand service to resell with such Product at Cisco's then-current price. At a minimum, DISTRIBUTOR will purchase packaged SMARTnet service.

## 4.0    SERVICES NOT COVERED UNDER THIS AGREEMENT

4.1 New Releases for Software.

4.2 Hardware repair/replacement service.

4.3 Additional services may be requested by DISTRIBUTOR, if available, at Cisco's then-current time and material rates.

4.4 Customization of existing Software for non-standard applications.

CISCO

4.5 Support or replacement of Product that is altered, modified, mishandled, destroyed or damaged by natural causes or damaged during unauthorized use.

4.6 Software problems resulting from third party equipment or causes beyond Cisco's control.

4.7 Any hardware upgrade of Product required to accept Bug Fixes.

## 5.0   TERMINATION

Upon expiration or termination of the Agreement, (i) all rights and licenses of DISTRIBUTOR hereunder shall terminate, (ii) DISTRIBUTOR shall immediately discontinue all representations that it provides maintenance services for Cisco Product, and (iii) end user access to CCO shall terminate.

## 6.0   SOFTWARE LICENSE.

DISTRIBUTOR acknowledges that it may receive Software as a result of services provided under this Agreement. DISTRIBUTOR agrees that it is licensed to distribute such Software only on Product covered under the services and subject to the terms and conditions of this Agreement and the Software license granted with the original acquisition. Except as otherwise specified in this Exhibit, DISTRIBUTOR shall not: copy, in whole or in part, Software or documentation; modify the Software, reverse compile or reverse assemble all or any portion of the Software; or rent, lease, distribute, sell, or create derivative works of the Software.



**EXHIBIT E**

**SOFTWARE LICENSE AGREEMENT**

**PART (i)**

THIS AGREEMENT IS AVAILABLE IN LANGUAGES OTHER THAN ENGLISH; PLEASE SEE YOUR CISCO SYSTEMS, INC. ("CISCO") RESELLER OR VISIT OUR WEBSITE AT WWW.CISCO.COM.

PLEASE READ THIS SOFTWARE LICENSE AGREEMENT CAREFULLY BEFORE DOWNLOADING, INSTALLING OR USING CISCO OR CISCO-SUPPLIED SOFTWARE.

BY DOWNLOADING OR INSTALLING THE SOFTWARE, OR USING THE EQUIPMENT THAT CONTAINS THIS SOFTWARE, YOU ARE CONSENTING TO BE BOUND BY THIS AGREEMENT. IF YOU DO NOT AGREE TO ALL OF THE TERMS OF THIS AGREEMENT, THEN (A) DO NOT DOWNLOAD, INSTALL OR USE THE SOFTWARE, AND (B) YOU MAY RETURN THE SOFTWARE FOR A FULL REFUND, OR, IF THE SOFTWARE IS SUPPLIED AS PART OF ANOTHER PRODUCT, YOU MAY RETURN THE ENTIRE PRODUCT FOR A FULL REFUND.  YOUR RIGHT TO RETURN AND REFUND EXPIRES 30 DAYS AFTER PURCHASE FROM CISCO OR AN AUTHORIZED CISCO RESELLER, AND APPLIES ONLY IF YOU ARE THE ORIGINAL PURCHASER.

*The following terms govern your use of the Software except to the extent a particular program (a) is the subject of a separate written agreement with Cisco or (b) includes a separate "click-on" license agreement as part of the installation process.*

**License.**  Subject to the terms and conditions of and except as otherwise provided in this Agreement, Cisco Systems, Inc. ("Cisco") and its suppliers grant to Customer ("Customer") a nonexclusive and nontransferable license to use the specific Cisco program modules, feature set(s) or feature(s) for which Customer has paid the required license fees (the "Software"), in object code form only. In addition, the foregoing license shall also be subject to each of the following limitations:

- Unless otherwise expressly provided in the documentation, Customer shall use the Software solely as embedded in, for execution on, or (where the applicable documentation permits installation on non-Cisco equipment) for communication with Cisco equipment owned or leased by Customer;

- Customer's use of the Software shall be limited to use on a single hardware chassis, on a single central processing unit, as applicable, or use on such greater number of chassises or central processing units as Customer may have paid Cisco the required license fee; and

- Customer's use of the Software shall also be limited as applicable to the number of issued and outstanding IP addresses, central processing unit performance, number of ports, and any other restrictions set forth in Cisco's product catalog for the Software.

**NOTE**:  For evaluation or beta copies for which Cisco does not charge a license fee, the above requirement to pay a license fee does not apply.

**General Limitations.**  Except as otherwise expressly provided under this Agreement, Customer shall have no right, and Customer specifically agrees not to:

(i)  transfer, assign or sublicense its license rights to any other person, or use the Software on unauthorized or secondhand Cisco equipment, and any such attempted transfer, assignment or sublicense shall be void;

**CISCO**

(ii) make error corrections to or otherwise modify or adapt the Software or create derivative works based upon the Software, or to permit third parties to do the same; or

(iii) decompile, decrypt, reverse engineer, disassemble or otherwise reduce the Software to human-readable form to gain access to trade secrets or confidential information in the Software.

To the extent required by law, at Customer's request, Cisco shall provide Customer with the interface information needed to achieve interoperability between the Software and another independently created program, on payment of Cisco's applicable fee. Customer shall observe strict obligations of confidentiality with respect to such information.

**Upgrades and Additional Copies.** For purposes of this Agreement, "Software" shall include (and the terms and conditions of this Agreement shall apply to) any upgrades, updates, bug fixes or modified versions (collectively, "Upgrades") or backup copies of the Software licensed or provided to Customer by Cisco or an authorized distributor for which Customer has paid the applicable license fees. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT: (1) CUSTOMER HAS NO LICENSE OR RIGHT TO USE ANY SUCH ADDITIONAL COPIES OR UPGRADES UNLESS CUSTOMER, AT THE TIME OF ACQUIRING SUCH COPY OR UPGRADE, ALREADY HOLDS A VALID LICENSE TO THE ORIGINAL SOFTWARE AND HAS PAID THE APPLICABLE FEE FOR THE UPGRADE; (2) USE OF UPGRADES IS LIMITED TO CISCO EQUIPMENT FOR WHICH CUSTOMER IS THE ORIGINAL END USER PURCHASER OR LESSEE OR WHO OTHERWISE HOLDS A VALID LICENSE TO USE THE SOFTWARE WHICH IS BEING UPGRADED; AND (3) USE OF ADDITIONAL COPIES IS LIMITED TO BACKUP PURPOSES ONLY.

**Proprietary Notices.** Customer agrees to maintain and reproduce all copyright and other proprietary notices on all copies, in any form, of the Software in the same form and manner that such copyright and other proprietary notices are included on the Software. Except as expressly authorized in this Agreement, Customer shall not make any copies or duplicates or any Software without the prior written permission of Cisco. Customer may make such backup copies of the Software as may be necessary for Customer's lawful use, provided Customer affixes to such copies all copyright, confidentiality, and proprietary notices that appear on the original.

**Protection of Information.** Customer agrees that aspects of the Software and associated documentation, including the specific design and structure of individual programs, constitute trade secrets and/or copyrighted material of Cisco. Customer shall not disclose, provide, or otherwise make available such trade secrets or copyrighted material in any form to any third party without the prior written consent of Cisco. Customer shall implement reasonable security measures to protect such trade secrets and copyrighted material. Title to Software and documentation shall remain solely with Cisco.

**Restricted Rights.** Cisco's commercial software and commercial computer software documentation is provided to United States Government agencies in accordance with the terms of this Agreement, and per subparagraph "(c)" of the "Commercial Computer Software - Restricted Rights" clause at FAR 52.227-19 (June 1987). For DOD agencies, the restrictions set forth in the "Technical Data-Commercial Items" clause at DFARS 252.227-7015 (Nov 1995) shall also apply.

**Term and Termination.** This Agreement is effective until terminated. Customer may terminate this Agreement at any time by destroying all copies of Software including any documentation. Customer's license rights under this Agreement will terminate immediately without notice from Cisco if Customer fails to comply with any provision of this Agreement. Upon termination, Customer must destroy all copies of Software in its possession or control.

**CISCO**

**PART (ii)**
***Limited Warranty.*** If Customer obtained the Software directly from Cisco, then Cisco warrants that during the Warranty Period (as defined below): (i) the media on which the Software is furnished will be free of defects in materials and workmanship under normal use; and (ii) the Software will substantially conform to its published specifications. The "Warranty Period" means a period beginning on the date of Customer's receipt of the Software and ending on the later of (a) ninety (90) days from the date of initial shipment of the Software by Cisco, or (b) the end of the minimum period required by the law of the applicable jurisdiction. In addition, Cisco may provide an additional limited Year 2000 warranty for the Software; information regarding this warranty and its applicability to the Software may be found at the web site address: www.cisco.com/warp/public/779/smbiz/service/y2k/y2k_comp.htm. The limited warranties extend only to Customer as the original licensee. Customer's sole and exclusive remedy and the entire liability of Cisco and its suppliers under these limited warranties will be, at Cisco or its service center's option, repair, replacement, or refund of the Software if reported (or, upon request, returned) to Cisco or its designee. Except as expressly granted in this Agreement, the Software is provided **AS IS**. Cisco does not warrant that the Software is error free or that Customer will be able to operate the Software without problems or interruptions. In addition, due to the continual development of new techniques for intruding upon and attacking networks, Cisco does not warrant that the Software or any equipment, system or network on which the Software is used will be free of vulnerability to intrusion or attack.

This warranty does not apply if the Software (a) is licensed for beta, evaluation, testing or demonstration purposes for which Cisco does not receive a license fee, (b) has been altered, except by Cisco, (c) has not been installed, operated, repaired, or maintained in accordance with instructions supplied by Cisco, (d) has been subjected to abnormal physical or electrical stress, misuse, negligence, or accident, or (e) is used in ultrahazardous activities.

If Customer obtained the Software from a Cisco reseller, the terms of any warranty shall be as provided by such distributor, and Cisco provides Customer no warranty with respect to such Software.

***Disclaimer of Warranties.*** EXCEPT AS SPECIFIED IN THIS WARRANTY, ALL EXPRESS OR IMPLIED CONDITIONS, REPRESENTATIONS, AND WARRANTIES INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OR CONDITION OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT, SATISFACTORY QUALITY OR ARISING FROM A COURSE OF DEALING, USAGE, OR TRADE PRACTICE, ARE HEREBY EXCLUDED TO THE EXTENT ALLOWED BY APPLICABLE LAW. TO THE EXTENT AN IMPLIED WARRANTY CANNOT BE EXCLUDED, SUCH WARRANTY IS LIMITED IN DURATION TO THE WARRANTY PERIOD. BECAUSE SOME STATES OR JURISDICTIONS DO NOT ALLOW LIMITATIONS ON HOW LONG AN IMPLIED WARRANTY LASTS, THE ABOVE LIMITATION MAY NOT APPLY TO YOU.

THIS WARRANTY GIVES YOU SPECIFIC LEGAL RIGHTS, AND YOU MAY ALSO HAVE OTHER RIGHTS, WHICH VARY FROM JURISDICTION TO JURISDICTION.

***Disclaimer of Liabilities.*** IN NO EVENT WILL CISCO OR ITS SUPPLIERS BE LIABLE FOR ANY LOST REVENUE, PROFIT, OR DATA, OR FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL, OR PUNITIVE DAMAGES HOWEVER CAUSED AND REGARDLESS OF THE THEORY OF LIABILITY ARISING OUT OF THE USE OF OR INABILITY TO USE THE SOFTWARE EVEN IF CISCO OR ITS SUPPLIERS HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. In no event shall Cisco's or its suppliers' liability to Customer, whether in contract, tort (including negligence), or otherwise, exceed the price paid by Customer. The foregoing limitations shall apply even if the above-stated warranty fails of its essential purpose. BECAUSE SOME STATES OR JURISDICTIONS DO NOT ALLOW LIMITATION OR EXCLUSION OF

**cisco**

CONSEQUENTIAL OR INCIDENTAL DAMAGES, THE ABOVE LIMITATION MAY NOT APPLY TO YOU.

***Customer Records.*** Customer grants to Cisco and its independent accountants the right to examine Customer's books, records and accounts during Customer's normal business hours to verify compliance with this Agreement. In the event such audit discloses non-compliance with this Agreement, Customer shall promptly pay to Cisco the appropriate licensee fees.

***Export.*** Software, including technical data, may be subject to U.S. export control laws, including the U.S. Export Administration Act and its associated regulations, and may be subject to export or import regulations in other countries. Customer agrees to comply strictly with all such regulations and acknowledges that it has the responsibility to obtain licenses to export, re-export, or import Software.

***General.*** This Agreement shall be governed by and construed in accordance with the laws of the State of California, United States of America, as if performed wholly within the state and without giving effect to the principles of conflict of law. If any portion hereof is found to be void or unenforceable, the remaining provisions of this Agreement shall remain in full force and effect. Cisco hereby specifically disclaims the UN Convention on Contracts for the International Sale of Goods. Except as expressly provided herein, this Agreement constitutes the entire agreement between the parties with respect to the license of the Software and supersedes any conflicting or additional terms contained in the purchase order.

ı|ıı|ıı
CISCO

## EXHIBIT F: Cisco Systems Point of Sale & Inventory Requirements

- Distributor's POS and Inventory must meet 'POS Certification Criteria' as per the table below.
- Distributor must submit POS and inventory on a weekly basis via the web using this URL http://tools.cisco.com/WWSF/dca/Home by 17:00 CET every Monday, twice a week on Mondays before 17:00 CET and Fridays before 14:00 CET (except Mexico 17:00 CET) or daily before 17:00 CET.
- POS and Inventory information must be in the format as shown on the templates posted on the following URL http://tools.cisco.com/WWSF/dca/Home under "Submission Templates" link in the navigation bar.
- All reports must comply with the published policy criteria, frequency and consistency.

a.   DETAILED POS REQUIREMENTS

1/      I. POS templates must be used to report weekly Point of Sale activity by 17:00 CET each Monday.
      II. Data must be clean (without foreign characters, extra spaces, etc…) and accurate (spell correctly).
      III. Column headings must be spelled correctly and rows must be populated completely to the last transaction.
      IV. Maximum number of rejected transactions is 0 per distributor.

2/      The required columns are listed in more detail under the "Submission Templates" link on the following URL: for details see http://tools.cisco.com/WWSF/dca/Home.

b.   DETAILED INVENTORY REQUIREMENTS

1. Inventory templates must be used to report Inventory Balances, extracted as at closed of business each Saturday, by 17:00 CET each Monday.
2. In any event of system glitches or processing delays, the Inventory data submission may be extended to 00:00 CET (midnight) provided Cisco is made aware of the delay prior to the 17:00 CET deadline.
3. Detailed Inventory fields with required columns can be found under the "Submission Templates" link available in the navigation bar on the following URL: http://tools.cisco.com/WWSF/dca/Home.

## ·|¡·¡|¡·
## CISCO

### Exhibit F1: Additional Cisco Systems Point of sale & Inventory Requirements

### Additional standard terms and conditions for all CISCO LATAM Point of Sale ("POS") and Inventory – Version 1.1

In order for POS or an Inventory file to be valid, it must be submitted in strict accordance with any, and all, of the following conditions. Any POS or Inventory not respecting these conditions shall be automatically invalid and thus refused by Cisco.

### POS SUBMISSIONS:

### Definition of POS:

In order for POS to be valid and true, it must be invoiced and shipped to a third party (reseller, 1-Tier, distributor, end user) prior to being submitted. Any distributor submitting twice weekly on Monday and Friday or daily should ensure that their POS submissions take into account sales made between and including the previous Thursday and Wednesday in the current week. Any distributor submitting weekly as opposed to daily should ensure that their Monday POS submissions only take into account sales made between and including the previous Sunday to the previous Saturday.

### Submissions:

POS submissions should be submitted by 17:00 CET. The submissions should be made on Mondays for distributors on a weekly POS schedule, on Mondays and Fridays for distributors on a twice weekly POS schedule or daily (Monday to Friday) for distributors on a daily POS schedule. Any POS for periods outside the previous week's dates of sale needs to be submitted to Cisco for written approval prior to being submitted via CCO. All product code errors mentioned in the Distributor-robo emails, automatically received after submissions, must be corrected and submitted prior to the deadline by Monday 17:00 CET.

Any and all POS must be submitted via de DCA tool: http://tools.cisco.com/WWSF/dca/Home. POS Template under the "Submission Templates" link of the DCA tool website should be use to submit the POS data. This link is on the bottom left hand side on the navigator bar.

For details on what each field on the template represents, please refer to the "POS Implementation Guide" document available under the "Submission Templates" page of the DCA Tool website.

Of those fields, the following fields are mandatory and must be populated:

Buyer/ Reseller Name
Buyer/ Reseller Country
Distributor to Reseller Invoice Date (Shipped Date)
Reseller to Distributor PO Number
Distributor to Reseller Invoice Number
Original Distributor to Reseller Invoice Number (for Negative POS)
Cisco Standard Part Number
Product Quantity
Reported Product Unit Price – USD
Product Serial Number
End User Name
End User Address line 1



**CISCO**

End User City
End User Zip Code
SO Number

Note:

1.  End user is always mandatory except for small business sales.

Further more, with regards the end user name field, this is a mandatory requirement when a rebate is to be claimed against the POS line and must be populated. Name such as SMB, Dummy end user, Reseller not willing and internal use etc. will not be accepted and must instead be populated with the **correct** end user name where the Cisco Product will be sold to. This requirement is only applicable to the extent permitted by applicable laws, including any applicable data protection laws.

**Negative POS:**

Negative POS lines must only be submitted for product returns (excluding stock rotations) or cancelled sales, where you have already submitted POS previously. The original Invoice number or Original Sales Order number must be provided when there is an RMA. Under no circumstances is negative POS to be submitted for resellers or end user changes. These changes will be made by the Cisco POS analyst, who will require proof of the actual correct reseller or end-user prior to making the changes. Such proof will comprise either a copy of a delivery note or an order request from the reseller, or any valid equivalent deemed to e sufficient by the said analyst to make the changes requested.

Each POS submission should be final and should therefore not require any correction (other than product code corrections).

Corrections will only be accepted if the POS transaction date is less than 20 days old at the time of the request for corrections. Only Cisco will make such corrections and the distributor (Cisco Distribution Partner, 2 tier-nonexclusive Distributor or Cisco Authorized Distributor) must not submit negative POS to cancel a previous POS submission.

**Distributor-to-distributor (D2D) transactions:**

All POS transactions for which the reseller name field is a distributor or the reseller is reselling to a Cisco distributor, are flagged as Distributor to Distributor or D2D by Cisco. However, the distributor sourcing from another distributor for the purpose of selling on would be entitled to claim a rebate against this line.

Transactions flagged as D2D are not available for claiming rebates and are not allocated to account managers.

This is without prejudice to any Cisco Authorized Source being entitled to source from and resell to any other Cisco Authorized Source.

If a distributor is selling for its own internal use, then the reseller field should mention "distributor internal use".

**INVENTORY SUBMISSIONS:**

**Definition of Inventory:**



This includes all inventory held by distributor (Cisco Distribution Partner, 2 Tier non-exclusive Distributor, Distributor or Cisco Authorized Distributor) as at a particular point in time, which has neither been invoiced nor POS'd out to a reseller.

**Submissions:**

Inventory submissions should be made by 17:00 CET on the same days as each POS submission. The inventory should be as of close of business on the day prior to the day the inventory report is submitted.

This applies even if the Inventory has not changed from the previous week, as your Inventory files are not carried forward, and as such a new file is required each week.

All inventories must be submitted through the DCA tool: http://tools.cisco.com/WWSF/dca/Home using the template available under the "Submission Templates" page of the DCA Tool website.

For details on what each field on the template represents, please refer to the "Implementation Guide available under the "Submission Templates" page of the DCA Tool.

**Corrections:**

All product code errors mentioned in the DCA-robo emails, automatically received after submissions, must be corrected and submitted prior to the deadline by Monday 17:00CET.

**Penalty for non-submission of inventory files:**

If a distributor has not submitted Inventory for two weeks running, without advising prior warning to Cisco, Cisco has the right to place a hold on all further rebate payments until full and complete and correct Inventory has been submitted.

**BALANCING CALCULATIONS:**

Further to timely submissions of POS and Inventory, you will also be required to submit a balancing calculation at summary level quarterly. This will include shipment received, inventory, POS and returns information for the previous quarter, and should balance with the detail of inventory and POS submitted.

*Shipment received:*

This would be a total of all shipments received from Cisco, whether logged as Inventory or shipped out directly as back to back orders, or via POS, during the previous quarter. On a detailed level this report would need to include all product ID, quantity, WPL price, purchase order numbers, sales order numbers, source vendor name and country, and serial numbers as provided by Cisco. For D2D transactions, the source vendor would be the initial distributor.

*Inventory:*

This would be the total value of your inventory held as at close of business Sunday as per your standard inventory submission.

.ı|ı.ı|ı.
**CISCO**

*POS:*

This would be the total value all POS sold by you during the previous quarter as per your standard POS submission.

*Returns information:*

This would be a total of all returns (stock rotation and other RMA's) shipped to Cisco in the previous quarter. On a detailed level this report would need to include all product ID, quantity, WPL price, purchase order numbers, sales order numbers, RMA numbers and serial numbers as provided by Cisco. As with POS and Inventory reports, this should be as of close of business Saturday prior to the Monday it is submitted.

*Goods in Transit (Internal):*

This would be a total of all products removed from your main warehouse's inventory but not yet logged in your branched inventory. On a detailed level this report would need to include all product ID, quantity, WPL price, purchase order numbers, sales order numbers and serial numbers as provided by Cisco.



### Exhibit F2: Cisco Systems Forecasting of Point of Sales & Gross New Bookings

### Additional standard term and conditions for all CISCO LATAM Point of Sale ("POS") and Gross New Bookings

In addition to any local reporting requirements, Distributor is required to submit, in strict accordance with all of the following conditions, Weekly, Monthly & Quarterly Forecasts. Distributor agrees to provide forecasts using the template which will be provided by Cisco for Gross New Bookings (Net of Cancellations), Net Point of Sale (POS), and will be measured against these criteria. Forecast accuracy is required to be within - 10% and +10%.

### WEEKLY POS FORECAST:

### As per the POS definition in Exhibit F1, Cisco requires;

Each and Every Monday by 11:00 CET all distributors should submit a forecast using the template. Distributors on a weekly POS schedule should submit a forecast of the total Net POS they will post to Cisco in the current week representing Sales Out from the previous week (Sunday to Saturday). Distributors on a twice weekly or daily POS schedule should submit a forecast of the total Net POS Sales Out from Thursday and Friday from the previous week and Monday, Tuesday and Wednesday of the current week. In the last week of the fiscal Quarter, the forecast from distributors on a daily or twice weekly POS schedule should be of Sales Out from Friday of the previous week to Friday of the current week.

### WEEKLY GROSS NEW BOOKINGS FORECAST:

Each and every Monday at 11:00 CET Confirmation of the bookings forecast must be received using the template.

ıı|ıı.ı|ıı.
**CISCO**

### Exhibit G

### Compliance with Anti-Corruption Laws

In connection with the sale or distribution of Cisco Products or Services, or otherwise in carrying out its obligations under this Agreement, Distributor represents and warrants the following:

(a)      Distributor will comply with all country, federal, state and local laws, ordinances, codes, regulations, rules, policies, regulations and procedures, including, without limitation, all anti-corruption laws, including, the U.S. Foreign Corrupt Practices Act (Applicable Laws).  Distributor can find more information about the FCPA at the following URL: http://www.usdoj.gov/criminal/fraud/docs/dojdocb.html,      or      by      contacting publicsectorcompliance@cisco.com.

(b)      Distributor shall not take any action or permit or authorize any action in violation of the Applicable Laws;

(c)      Distributor will not use money or other consideration paid by Cisco (and Distributor will not use its own money on Cisco's behalf) for any unlawful purposes, including any purposes violating Applicable Laws, such as direct or indirect payments, for the purpose of assisting Cisco in obtaining or retaining business, to any of the following:

government officials (including any person holding an executive, legislative, judicial or administrative office, whether elected or appointed, or of any public international organization, such as the United Nations or World Bank, or any person acting in any official capacity for or on behalf of such government, public enterprise or state-owned business);

political parties or party officials,

candidates for political office, or

any person, while knowing that all or a portion of such money or thing of value will be offered, given or promised, directly or indirectly, to any of the above-identified persons or organizations.

(d)      Upon request by Cisco, Distributor will require that its own subcontractors, consultants, agents or representatives execute a written compliance statement containing substantially similar representations as are contained in this section.

(e)      Distributor's record keeping obligations, set forth in the "Audit" provision in the Agreement, shall apply equally to Distributor's representations and warranties in this section, Cisco's audit rights, as set forth herein, and Distributor's compliance with the Applicable Laws;

(f)      In no event shall Cisco be obligated under this Agreement to take any action or omit to take any action that Cisco believes, in good faith, would cause it to be in violation of any laws of the Territory(-ies) identified in this Agreement or the Applicable Laws.

(g)      The owner(s), principals, directors, officers and employees of Distributor's business are not government officials or employees (at any level of government);

··|··|··
CISCO

(h)     The owner(s), principals, directors, officers and employees of Distributor's business are not employees of Cisco (including any of its affiliated companies);

(i)     Distributor, its owner(s), principals, directors and officers have not been formally charged with, convicted of, or plead guilty to, any offense involving fraud or corruption;

(j)     Distributor, its owner(s), principals, directors and officers have not been listed by any government or public agency (such as the United Nations or World Bank) as debarred, suspended, or proposed for suspension or debarment or otherwise ineligible for government procurement programs;

(k)     Distributor has not offered to pay, nor has Distributor paid, nor will Distributor pay, any political contributions to any person or entity on behalf of Cisco;

(l)     If Distributor is a non-governmental entity, it will notify Cisco in writing if any of its owners, principals, directors, officers, or employees are or become during the term of this Agreement officials, officers or representatives of any government, political party or candidate for political office outside the United States and are responsible for a decision regarding obtaining or retaining business for Cisco Products or Services by such government.   Distributor will also promptly inform Cisco if any other portion of the statements set forth in sections (g) through (k) in this Appendix A changes.

(m)     Notwithstanding any other provision in this Agreement, Cisco may terminate this Agreement immediately upon written notice if Distributor breaches any of the representations and warranties set forth in this section.  Distributor will indemnify and hold harmless Cisco for any violation by Distributor of any Applicable Laws.

(n)     Distributor can report to Cisco any concerns it may have regarding any business practices by emailing ethics@cisco.com, or by calling Cisco's Helpline toll free number in North America 1-877-571-1700 or worldwide number (reverse calling charges to Cisco) 001-770-776-5611.   Contact ethics@cisco.com for other available regional hotline numbers.

(o)     Distributor has read and agrees to act consistently with Cisco's" Compliance with Global Anticorruption Laws by Cisco's Partners," a copy of which is included in the click to accept contract renewal tool, and which is also published at http://www.cisco.com/legal/anti_corruption.html.

**CISCO**

### Exhibit H

### AFFILIATES LIST

| Corporate Name | Address | Territory |
|---|---|---|
| Abano RJ Distribuidora Ltda | Av. Rio Branco, 37 – 16º andar<br>Pça Mauá<br>20090-003<br>Rio de Janeiro - RJ | Brazil |
| Alcateia Engenharia de Sistemas Ltda | Rua dos Italianos, 1127<br>Bom Retiro<br>01131-000<br>São Paulo - SP | Brazil |





**EXHIBIT I**
**COMMERCE AGREEMENT**

Please note that the present Exhibit is currently electronically available.  Consequently, the Parties hereby refer to URL: http://www.cisco.com/pcgi-bin/front.x/ica/ica.pl for the latest version.